# MOUNTAIN TIMBER COMPANY *v.* STATE OF WASHINGTON.

### ERROR TO THE SUPREME COURT OF THE STATE OF WASHINGTON.

No. 13. Argued March 1, 2, 1916; restored to docket for reargument November 13, 1916; reargued January 30, 1917.—Decided March 6, 1917.

The Washington Workmen's Compensation Act, as originally enacted, Laws 1911, c. 74, establishes a state fund for the compensation of workmen injured, and the dependents of workmen killed, in employments classed as hazardous; abolishes, except in a few specified cases, the action at law by employee against employer for damages due to negligence, and deprives the courts of jurisdiction over such controversies. It is obligatory upon both employers and employees. The fund is made the sole source of compensation, and is supplied by assessments upon each employer of definite percentages of his total

pay-roll. It classifies industries in groups, and aims to adjust the percentage for each group, according to hazard, declaring this the most accurate and equitable method and promising future readjustments by the legislature of both classification and percentages to fit experience. The contributions of each group form a separate account or sub-fund, applicable to no other demands for compensation than those arising in the industries composing that group. Contributions, after the first, are not to exceed what is necessary to meet actual losses in the group for which they are exacted. The act expressly saves all actions and causes existing when it took effect, as between employers and employees, some months after its passage.

*Held:* (1) The act not being valid against employers if not valid as against employees, an employer may question its constitutionality in both aspects.

(2) Viewed from the standpoint of employees, the act is the same in principle as the act sustained in *New York Central R. R. Co.* v. *White, ante,* 188.

(3) The act is not objectionable upon the ground that, in violation of the Seventh Amendment, it does away with trial by jury in the federal courts, since it does not undertake to interfere with that mode of trial in respect of private rights of action which are preserved, but abolishes for the future all right of recovery as between employer and employee in the cases which it covers, leaving nothing for trial by jury either in the state or in the federal courts.

(4) Taking effect *in futuro* and expressly preserving intervening causes of action, the act disturbs no vested rights.

(5) In requiring employers to make payments to the state fund for the compensation of injured employees and the dependents of those killed, without regard to fault, the act does not deprive employers of their property, or of their liberty to acquire it, in violation of the Fourteenth Amendment, provided the compensation be not excessive and unreasonable, and provided the burden be fairly distributed among the employers included in the industries affected.

(6) In the absence of any showing to the contrary, the compensation provided by the act may be regarded as not unreasonable; this is not to say, however, that any scale of compensation, however insignificant on the one hand or onerous on the other, would be supportable; any question of that kind may be met when it arises.

(7) As for the scheme for distributing the burden among employers, the method of applying percentages to pay-rolls, in view of the legislative declaration of its accuracy and fairness, cannot be deemed arbitrary if the percentages be fair; and although in this act the percentages seem high, it is plain that, as to each group of industries,

the assessments, after the initial payments, will be limited to the amounts necessary to meet the losses arising in and chargeable to that group.

(8) The declarations of the act should be accepted as further evidence of an intelligent effort to limit the burden to the requirements of each industry.

(9) Since the question whether a state law deprives of a right secured by the Constitution depends not upon how the law is characterized but upon its practical operation and effect, and since the Constitution does not require a separate exercise of the state powers of regulation and taxation, the crucial question is whether this legislation, be it regarded as an exercise of the power of regulation, or a combination of regulation and taxation, clearly appears to be not a fair and reasonable exertion of governmental power but so extravagant or arbitrary as to constitute abuse of power.

A State in the exercise of its power to pass such legislation as reasonably is deemed necessary to promote the health, safety and general welfare of its people, may regulate the carrying on of all those industrial occupations that frequently and inevitably produce personal injuries and disability with consequent loss of earning power among employees, and occasional loss of life of those upon whom others are dependent for support, and may require that these human losses be charged against the industry, either directly, or by publicly administering the compensation and distributing the cost among the industries affected by means of a reasonable system of occupation taxes.

In the absence of any particular showing of erroneous classification, the evident purpose of an act to classify various occupations according to the respective hazard of each is sufficient answer to any contention that the act improperly distributes the burdens among the several industries.

One who is engaged in the business of logging timber, operating a logging railroad, and operating a saw-mill with power-driven machinery, is not in a position to question the validity of a classification of other businesses as hazardous.

The provision in § 4 of the Washington Workmen's Compensation Law making it a misdemeanor for any employer to deduct any part of the premium from the wages or earnings of his employees will not be construed, in the absence of any constraining state construction, so broadly as to prohibit employers and employees, in agreeing upon terms of employment, from taking into consideration the fact that the employer is a contributor to the state fund and the resulting effect of the act upon the rights of the parties.

*Quære:* Whether, if so construed, the act would not be objectionable as an unconstitutional interference with the freedom of contract.

Whether the constitutional guaranty of republican form of government (Art. IV, § 4) has been violated, is not a judicial question, but a political question addressed to Congress.

75 Washington, 581, affirmed.

THE case is stated in the opinion.

*Mr. F. Markoe Rivinus* and *Mr. Theodore W. Reath,* with whom *Mr. Edmund C. Strode* and *Mr. Coy Burnett* were on the briefs, for plaintiff in error:

The act is sought to be supported upon the grounds that the present system thrusts the burden upon those who are economically weakest, makes recoveries difficult, exposes employers to excessive verdicts, wastes the insurance which it provides for employees, produces antagonism between employer and employee, and subjects society to economic loss. The theory of the law, as of its German prototype, is a theory of economic improvement at the expense of the employer. It does not create or conserve rights of members of society as individuals. No alteration is intended in the contractual relations between employer and employee in the way of regulating the physical performance of the duties which the relations involve, by prescribing rules of conduct and fixing liability for non-observance. The object is rather to use the relationship created by the contracts of the parties to aid as a basis for raising between them a new and independent contract of insurance to serve this economic policy.

The law of tort, including employers' liability statutes, pertains to the redress of private wrongs. The damages recoverable are intended to be commensurate with and to reimburse the employee for the injury suffered. But the obligations of workmen's compensation accrue from contingencies not within the control of the parties and thus have no relation to their conduct; the compensation is

not intended to be commensurate with the injury but is based upon some percentage of the employee's wages.

The objects of this legislation may suffice for the legislative power of Germany, but are not a legislative basis accordant with constitutional restraints. There is grave danger in good intentions; Webster's Speeches, National ed., 1903, p. 207; and foreign experience shows that from "accident" through "occupational diseases" and their "*sequelæ*," this system leads to the insurance of sickness and of unemployment, and ultimately to old-age pensions, until no duty of thrift or foresight is left to the workman or employer. The policy points clean beyond the relation of master and servant to the inclusion of all misfortune.

The Fourteenth Amendment was adopted to preclude such philanthropic interference with the liberty of a self-reliant race. If the centralized advantages of communism or socialism are deemed preferable, the Constitution provides a method of amendment resulting in certainty of right. The idea, so often suggested, that somehow constitutional restraints stand as a barrier to modern progress is based on a one-sided view. The choice is not a choice of the supposed advantages of socialism and the defects of individualism but of the advantages and defects considered together of these two great conceptions. But that choice may not be made or sanctioned by this court for the nation. The question here is, has the Constitution limited the state legislatures so as to preclude this legislation and the socialistic conception of governmental function upon which it is based? We shall not be able to answer by any considerations of mere economic policy.

In the present instance the legislature lays the ground for this so-called exercise of the police power by a finding that substantially all of the industrial operations in the State are "extra hazardous." By no intelligible definition or understanding of the words "extra hazardous" can this finding be true. All occupations are in some degree haz-

ardous. Life is hazardous. Demonstrably many of the industries named in the law are not extra hazardous as compared with agricultural or domestic occupations. Statistically, agriculture, for example, proves one of the most hazardous of all occupations, more hazardous than railroading. Yet farming is omitted from the act. The legislature cannot say that which is either obviously impossible or demonstrably untrue, and having said it be above judicial review and constitutional restraint. *Lochner* v. *New York*, 198 U. S. 45; *Muller* v. *Oregon*, 208 U. S. 420. There can be no permanence and stability in the fundamental concepts of government if the courts may abandon the attempt to define the limits of police power as impossible and then justify, upon legislative fiat, a law against constitutional objection as an exercise of that power. In *Lochner* v. *New York, supra,* this court realized and faced its difficult duty in this regard. That was a difficult case owing to a conflict of evidence as to hazard. But the principle of the case, that legislative fiat cannot make hazard if none exists, is changeless and established by all authority in this court. The Washington law, in substantially all the callings of industrial life, by such a fiat, attempts to deprive the employer and employee of liberty of contract by requiring the employer to insure his employee against industrial accident and the employee to surrender his other rights. The law includes bakeries under "working in food stuffs," also "creameries"—in short, substantially all industrial occupations.

Compensation laws are based on a socialistic, economic theory. That theory has no relation to hazard. The farm-hand or domestic servant who breaks his arm at work is from the economic view-point as much entitled to compensation and state support as the industrial worker. And such was the German and English experience, where the compensation scheme was of necessity finally extended to all employments irrespective of hazard. The essay on

hazard which constitutes the introduction of the Washington law is for the purpose of meeting constitutional objection to a socialistic scheme; but hazard as a ground of the law is embarrassing in the execution of the economic policy. For we find hazard put forward in justification of the law, but stretched beyond judicial recognition. Hazard is put forward to meet constitutional objection; while the conflicting economic theory, which must disregard hazard, is put forward to justify the law under the police power.

The law cannot be justified as special taxation upon employers to compensate employees for injuries incurred in employment. In this aspect the taxing power is invoked to execute an economic theory rather than to raise revenue. See Cooley on Taxation, p. 1125. And so the problem is not changed, for the law must still be a legitimate exercise of the police power. The problem of restraints, then, is not simplified by reference to the taxing power; it is further complicated by consideration of a superadded set of restraints,—those appropriate to the taxing power.

Taxation must always be according to constitutional restraints. Economic theory cannot alone justify its exercise. Economic advantage may inhere in or result from a particular tax scheme but this is incidental, and not the constitutional justification of the scheme. If economic advantage would justify the taking of property for some purpose benign in itself, we should see the end of constitutional restraints upon the taxing power. The power to levy taxes must be exercised in furtherance of some public purpose. *Savings & Loan Association* v. *Topeka*, 20 Wall. 655.

The purpose of this law is not public. The object is to impose the ordinary risks of the employees' industrial life upon the employer alone. The considerations of policy advanced in support of this legislaton could not

confine its scope to the risks of industrial life. Every casualty which might cause distress, such as sickness, unemployment or old age, would equally justify and (as history has shown) require a state grant of the employer's money. *Chicago* v. *Sturges*, 222 U. S. 313, distinguished.

The cases supporting special assessments depend on compensatory benefits. *Hammett* v. *Philadelphia*, 65 Pa. St. 146, 157. Substitution of liability in all cases for liability in tort for negligence is not such a benefit. The purpose of the law is not confined to the poor and the indigent, and hence is not for the maintenance of public charity. *Weismer* v. *Village of Douglas*, 64 N. Y. 91; *Ohio & Mississippi Ry. Co.* v. *Lackey*, 78 Illinois, 55; *Ives* v. *South Buffalo Ry.*, 201 N. Y. 271, 320.

The act takes the employer's property without legal reason, invades his and his employee's right of private contract in a matter with which the public has no concern, by introducing a term of industrial insurance, and is not due process or equal protection required by the Fourteenth Amendment. *Bank* v. *Okley*, 4 Wheat. 244; Webster's argument in *Dartmouth College* v. *Woodward*, 4 Wheat. 518, 581; *Oregon Railroad & Navigation Co.* v. *Fairchild*, 224 U. S. 510, 524, 525.

*St. Louis & San Francisco Ry. Co.* v. *Mathews*, 165 U. S. 1; *Heeg* v. *Licht*, 80 N. Y. 579; *Rylands* v. *Fletcher*, L. R., 3 H. L. 330; *Actiesselskabet Ingrid* v. *Central R. Co. of New Jersey*, 216 Fed. Rep. 72, and similar cases involved laws concerning injuries resulting from dangerous agencies; *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, a voluntary compensation law; *Chicago, Burlington & Quincy R. R. Co.* v. *McGuire*, 219 U. S. 549, a law forbidding contracts against public policy; *Chicago, Rock Island & Pacific Ry. Co.* v. *Zernecke*, 183 U. S. 582, and *Noble State Bank* v. *Haskell*, 219 U. S. 104, business affected by public interest.

The "prevailing morality" referred to by Mr. Justice

Holmes in the *Haskell Case* does not mean the transient opinion of a majority. Such a construction of the word "prevailing" "would justify any legislation, if only supported by a sufficient popular demand." *Ives* v. *South Buffalo Ry.*, *supra*, p. 319. Mr. Justice Holmes used the word "prevailing" in the sense of predominant for all time and was alluding, in general terms, to moral precepts which are axiomatic. *Jensen* v. *Southern Pacific Co.*, 215 N. Y. 514, was an erroneous interpretation of the decision of this court in the *Haskell Case*, *supra*, the New York court failing to distinguish between private business and business, like banking, which is of direct public concern. *Atlantic Coast Line R. R. Co.* v. *Riverside Mills*, 219 U. S. 186, relates to carriers, and *St. Louis, Iron, Mountain & Southern Ry. Co.* v. *Taylor*, 210 U. S. 281, to a law creating a substantive duty of care. *Louisville & Nashville R. R. Co.* v. *Melton*, 218 U. S. 36, is no authority for the arbitrary classification of substantially all industrial businesses under one head as extra hazardous.

*Mr. W. V. Tanner*, Attorney General of the State of Washington, for defendant in error.

MR. JUSTICE PITNEY delivered the opinion of the court.

This was an action brought by the State against plaintiff in error, a corporation engaged in the business of logging timber and operating a logging railroad and a sawmill having power-driven machinery, all in the State of Washington, to recover under c. 74 of the Laws of 1911, known as the Workmen's Compensation Act, certain premiums based upon a percentage of the estimated pay-roll of the workmen employed by plaintiff in error during the three months beginning October 1, 1911. Plaintiff in error by demurrer raised objections to the act based upon the Constitution of the United States.

The Supreme Court of Washington overruled them, and affirmed a judgment in favor of the State, 75 Washington, 581, following its previous decision in *State, ex rel. Davis-Smith Co.* v. *Clausen*, 65 Washington, 156; and the case comes here under § 237, Judicial Code.

The act establishes a state fund for the compensation of workmen injured in hazardous employment, abolishes, except in a few specified cases, the action at law by employee against employer to recover damages on the ground of negligence, and deprives the courts of jurisdiction over such controversies. It is obligatory upon both employers and employees in the hazardous employments, and the state fund is maintained by compulsory contributions from employers in such industries, and is made the sole source of compensation for injured employees and for the dependents of those whose injuries result in death. We will recite its provisions to an extent sufficient to show the character of the legislation.

The first section contains a declaration of policy, reciting that the common-law system governing the remedy of workmen against employers for injuries received in hazardous work is inconsistent with modern industrial conditions, and in practice proves to be economically unwise and unfair; that the remedy of the workman has been uncertain, slow and inadequate; that injuries in such employments, formerly occasional, have become frequent and inevitable; and that the welfare of the State depends upon its industries, and even more upon the welfare of its wage-workers. "The State of Washington, therefore, exercising herein its police and sovereign power, declares that all phases of the premises are withdrawn from private controversy, and sure and certain relief for workmen, injured in extra hazardous work, and their families and dependents is hereby provided regardless of questions of fault and to the exclusion of every other remedy, proceeding or compensation, except as otherwise provided in this

act; and to that end all civil actions and civil causes of action for such personal injuries and all jurisdiction of the courts of the state over such causes are hereby abolished, except as in this act provided."

The second section, declaring that while there is a hazard in all employment, certain employments are recognized as being inherently constantly dangerous, enumerates those intended to be embraced within the term "extra hazardous," including factories, mills and workshops where machinery is used, printing, electrotyping, photo-engraving and stereotyping plants where machinery is used; foundries, blast furnaces, mines, wells, gas works, water works, reduction works, breweries, elevators, wharves, docks, dredges, smelters, powder works; logging, lumbering, and shipbuilding operations; logging, street and interurban railroads; steamboats, railroads, and a number of others; at the same time declaring that if there be or arise any extra hazardous occupation not enumerated, it shall come under the act, and its rate of contribution to the accident fund shall be fixed by the Department created by the act upon the basis of the relation which the risk involved bears to the risks classified, until the rate shall be fixed by legislation. The third section contains a definition of terms, and, among them, "Workman means every person in this state, who, after September 30, 1911, is engaged in the employment of an employer carrying on or conducting any of the industries scheduled or classified in section 4, whether by way of manual labor or otherwise, and whether upon the premises or at the plant, or, he being in the course of his employment, away from the plant of his employer;" with a proviso giving to a workman injured while away from the plant through the negligence or wrong of another not in the same employ, or, if death result from the injury, to his widow, children, or dependents, an election whether to take under the act or to seek a remedy against the third party. "Injury"

is defined as an injury resulting from some fortuitous event, as distinguished from the contraction of disease.

Section 4 contains a schedule of contribution, reciting that industry should bear the greater portion of the burden of the cost of its accidents, and requiring each employer prior to January 15th of each year to pay into the state treasury, in accordance with the schedule, a sum equal to a percentage of his total pay-roll for the year, "the same being deemed the most accurate method of equitable distribution of burden in proportion to relative hazard." The application of the act as between employers and workmen is made to date from the first day of October, 1911, the payment for that year to be made prior to that date and upon the basis of the pay-roll of the last preceding three months of operation. At the end of each year an adjustment of accounts is to be made upon the basis of the actual pay-roll. The schedule divides the various occupations into groups, and imposes various percentages upon the different groups, the lowest being 1½%, in the case of the textile industries, creameries, printing establishments, etc., and the highest being 10%, in the case of powder works. The same section establishes 47 different classes of industry, and declares:

"For the purpose of such payments accounts shall be kept with each industry in accordance with the classification herein provided and no class shall be liable for the depletion of the accident fund from accidents happening in any other class. Each class shall meet and be liable for the accidents occurring in such class. There shall be collected from each class as an initial payment into the accident fund as above specified on or before the 1st day of October, 1911, one-fourth of the premium of the next succeeding year, and one-twelfth thereof at the close of each month after December, 1911: Provided, Any class having sufficient funds credited to its account at the end of the first three months or any month thereafter, to meet

the requirements of the accident fund, that class shall not be called upon for such month. In case of accidents occurring in such class after lapsed payment or payments said class shall pay the said lapsed or deferred payments commencing at the first lapsed payment, as may be necessary to meet such requirements of the accident fund. The fund thereby created shall be termed the 'accident fund' which shall be devoted exclusively to the purpose specified for it in this act. *In that the intent is that the fund created under this section shall ultimately become neither more nor less than self-supporting, exclusive of the expense of administration, the rates in this section named are subject to future adjustment by the legislature, and the classifications to rearrangement following any relative increase or decrease of hazard shown by experience.*[1] . . . . If, after this act shall have come into operation, it is shown by experience under the act, because of poor or careless management, any establishment or work is unduly dangerous in comparison with other like establishments or works, the department may advance its classification of risks and premium rates in proportion to the undue hazard. In accordance with the same principle, any such increase in classification or premium rate, shall be subject to restoration to the schedule rate. . . . If, at the end of any

---

[1] By Sess. Laws 1915, c. 188, p. 674, 677, § 4 was amended so as to substitute in the place of the clause italicised the following: "In that the intent is that the fund created under this section shall ultimately become neither more nor less than self-supporting, exclusive of the expense of administration, the rates named in this section are subject to future adjustment by the industrial insurance department, in accordance with any relative increase or decrease in hazard shown by experience, and if in the judgment of the industrial insurance department the moneys paid into the fund of any class or classes shall be insufficient to properly and sufficiently distribute the burden of expense of accidents occurring therein, the department may divide, rearrange or consolidate such class or classes, making such adjustment or transfer of funds as it may deem proper."

year, it shall be seen that the contribution to the accident fund by any class of industry shall be less than the drain upon the fund on account of that class, the deficiency shall be made good to the fund on the 1st day of February of the following year by the employers of that class in proportion to their respective payments for the past year."

Section 5 contains a schedule of the compensation to be awarded out of the accident fund to each injured workman, or to his family or dependents in case of his death, and declares that except as in the act otherwise provided such payment shall be in lieu of any and all rights of action against any person whomsoever. Where death results from the injury, the compensation includes the expenses of burial, not exceeding $75 in any case, a monthly payment of $20 for the widow or invalid widower, to cease at remarriage, and $5 per month for each child under the age of 16 years until that age is reached, but not exceeding $35 in all, with a lump sum of $240 to a widow upon her remarriage; if the workman leaves no wife or husband, but a child or children under the age of 16 years, there is to be a monthly payment of $10 to each child until that age is reached, but not exceeding a total of $35 per month; if there be no widow, widower, or child under the age of 16 years, other dependent relatives are to receive monthly payments equal to 50% of the average monthly support actually received by such dependent from the workman during the twelve months next preceding his injury, but not exceeding a total of $20 per month. For permanent total disability of a workman, he is to receive if unmarried $20, or, if married, $25 per month, with $5 per month additional for each child under the age of 16 years, but not exceeding $35 per month in all. (Section 7 provides that the monthly payment, in case of death or permanent total disability, may be converted into a lump sum payment, not in any case exceeding $4,000, according to the expect-

ancy of life.) For temporary total disability there is a somewhat different scale, compensation to cease when earning power is restored. For permanent partial disability the workman is to receive compensation in a lump sum equal to the extent of the injury, but not exceeding $1,500.

By § 6, if injury or death results to a workman from his deliberate intention to produce it, neither he nor his widow, child, or dependents shall receive any payment out of the fund. If injury or death results to a workman from the deliberate intention of the employer to produce it, the workman or his widow, child, or dependent shall have the privilege to take under the act, and also have a cause of action against the employer for any excess of damage over the amount receivable under the act.

By § 19 provision is made for the adoption of the act by the joint election of any employer and his employees engaged in works not extra hazardous. By § 21 the Industrial Insurance Department is created, consisting of three commissioners. By § 20 a judicial review is given in the nature of an appeal to the Superior Court from any decision of the Department upon questions of fact or of the proper application of the act, but not upon matters resting in the discretion of the Department. Other sections provide for matters of detail, and § 11 renders void any agreement by employer or workman to waive the benefit of the act.

From this recital it will be clear that the fundamental purpose of the act is to abolish private rights of action for damages to employees in the hazardous industries (and in any other industry at the option of employer and employees), and to substitute a system of compensation to injured workmen and their dependents out of a public fund established and maintained by contributions required to be made by the employers in proportion to the hazard of each class of occupation.

While plaintiff in error is an employer, and cannot succeed without showing that its constitutional rights as employer are infringed (*Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 544; *Jeffrey Mfg. Co.* v. *Blagg*, 235 U. S. 571, 576), yet it is evident that the employer's exemption from liability to private action is an essential part of the legislative scheme and the *quid pro quo* for the. burdens imposed upon him, so that if the act is not valid as against employees it is not valid as against employers.

However, so far as the interests of employees and their dependents are concerned, this act is not distinguishable in any point raising a constitutional difficulty from the New York Workmen's Compensation Act, sustained in *New York Central R. R. Co.* v. *White*, decided this day, *ante*, 188. It is true that in the Washington Act the state fund is the sole source from which the compensation shall be paid, whereas the New York Act gives to the employer an option to secure the compensation either through state insurance, insurance with an authorized insurance corporation, or by a deposit of securities with the state commission. But we find here no ground for a distinction unfavorable to the Washington law.

So far as employers are concerned, however, there is a marked difference between the two laws, because of the enforced contributions to the state fund that are characteristic of the Washington Act, and it is upon this feature that the principal stress of the argument for plaintiff in error is laid.

Two of the constitutional objections may be disposed of briefly. It is urged that the law violates § 4 of Article IV of the Constitution of the United States, guaranteeing to every State in the Union a republican form of government. As has been decided repeatedly, the question whether this guaranty has been violated is not a judicial but a political question, committed to Congress and not to the courts. *Luther* v. *Borden*, 7 How. 1, 39, 42; *Pacific*

*States Telephone & Telegraph Co.* v. *Oregon,* 223 U. S. 118; *Kiernan* v. *Portland, Oregon,* 223 U. S. 151; *Marshall* v. *Dye,* 231 U. S. 250, 256; *Davis* v. *Ohio,* 241 U. S. 565.

The Seventh Amendment, with its provision for preserving the right of trial by jury, is invoked. It is conceded that this has no reference to proceedings in the state courts (*Minneapolis &. St. Louis R. R. Co.* v. *Bombolis,* 241 U. S. 211, 217), but it is urged that the question is material for the reason that if the act be constitutional it must be followed in the federal courts in cases that are within its provisions. So far as private rights of action are preserved, this is no doubt true; but with respect to those we find nothing in the act that excludes a trial by jury. As between employee and employer, the act abolishes all right of recovery in ordinary cases, and therefore leaves nothing to be tried by jury.

The only serious question is that which is raised under the "due process of law" and "equal protection" clauses of the Fourteenth Amendment. It is contended that since the act unconditionally requires employers in the enumerated occupations to make payments to a fund for the benefit of employees, without regard to any wrongful act of the employer, he is deprived of his property, and of his liberty to acquire property, without compensation and without due process of law. It is pointed out that the occupations covered include many that are private in their character, as well as others that are subject to regulation as public employments, and it is argued that with respect to private occupations (including those of plaintiff in error) a compulsory compensation act does not concern the interests of the public generally, but only the particular interests of the employees, and is unduly oppressive upon employers and arbitrarily interferes with and restricts the management of private business operations.

The statute, although approved March 14, 1911, took effect as between employers and workmen on October 1

in that year, actions pending and causes of action existing on September 30 being expressly saved. It therefore disturbed no vested rights, its effect being confined to regulating the relation of employer and employee in the hazardous occupations *in futuro*.

If the legislation could be regarded merely as substituting one form of employer's liability for another, the points raised against it would be answered sufficiently by our opinion in *New York Central R. R. Co.* v. *White, supra,* where it is pointed out that the common-law rule confining the employer's liability to cases of negligence on his part or on the part of others for whose conduct he is made answerable, the immunity from responsibility to an employee for the negligence of a fellow employee, and the defenses of contributory negligence and assumed risk, are rules of law that are not beyond alteration by legislation in the public interest; that the employer has no vested interest in them nor any constitutional right to insist that they shall remain unchanged for his benefit; and that the States are not prevented by the Fourteenth Amendment, while relieving employers from liability for damages measured by common-law standards and payable in cases where they or others for whose conduct they are answerable are found to be at fault, from requiring them to contribute reasonable amounts and according to a reasonable and definite scale by way of compensation for the loss of earning power arising from accidental injuries to their employees, irrespective of the question of negligence, instead of leaving the entire loss to rest where it may chance to fall, that is, upon particular injured employees and their dependents.

But the Washington law goes further, in that the enforced contributions of the employer are to be made whether injuries have befallen his own employees or not, so that however prudently one may manage his business, even to the point of immunity to his employees from acci-

dental injury or death, he nevertheless is required to make periodical contributions to a fund for making compensation to the injured employees of his perhaps negligent competitors.

In the present case the Supreme Court of Washington (75 Washington, 581, 583), sustained the law as a legitimate exercise of the police power, referring at the same time to its previous decision in the *Clausen Case*, 65 Washington, 156, 203, 207, which was rested principally upon that power, but also (pp. 203, 207), sustained the charges imposed upon employers engaged in the specified industries as possessing the character of a license tax upon the occupation, partaking of the dual nature of a tax for revenue and a tax for purposes of regulation. We are not here concerned with any mere question of construction, nor with any distinction between the police and the taxing powers. The question whether a state law deprives a party of rights secured by the Federal Constitution depends not upon how it is characterized, but upon its practical operation and effect. *Henderson* v. *Mayor of New York*, 92 U. S. 259, 268; *Stockard* v. *Morgan*, 185 U. S. 27, 36; *Galveston, Harrisburg & San Antonio Ry. Co.* v. *Texas*, 210 U. S. 217, 227; *Western Union Telegraph Co.* v. *Kansas*, 216 U. S. 1, 28, 30; *Ludwig* v. *Western Union Telegraph Co.*, 216 U. S. 146, 162; *St. Louis Southwestern Ry. Co.* v. *Arkansas*, 235 U. S. 350, 362. And the Federal Constitution does not require a separate exercise by the States of their powers of regulation and of taxation. *Gundling* v. *Chicago*, 177 U. S. 183, 189.

Whether this legislation be regarded as a mere exercise of the power of regulation, or as a combination of regulation and taxation, the crucial inquiry under the Fourteenth Amendment is whether it clearly appears to be not a fair and reasonable exertion of governmental power, but so extravagant or arbitrary as to constitute an abuse of power. All reasonable presumptions are in favor of

its validity, and the burden of proof and argument is upon those who seek to overthrow it. *Erie R. R. Co.* v. *Williams,* 233 U. S. 685, 699. In the present case it will be proper to consider: (1) Whether the main object of the legislation is, or reasonably may be deemed to be, of general and public moment, rather than of private and particular interest, so as to furnish a just occasion for such interference with personal liberty and the right of acquiring property as necessarily must result from carrying it into effect. (2) Whether the charges imposed upon employers are reasonable in amount, or, on the other hand, so burdensome as to be manifestly oppressive. And (3) whether the burden is fairly distributed, having regard to the causes that give rise to the need for the legislation.

As to the first point: The authority of the States to enact such laws as reasonably are deemed to be necessary to promote the health, safety, and general welfare of their people, carries with it a wide range of judgment and discretion as to what matters are of sufficiently general importance to be subjected to state regulation and administration. *Lawton* v. *Steele,* 152 U. S. 133, 136. "The police power of a State is as broad and plenary as its taxing power." *Kidd* v. *Pearson,* 128 U. S. 1, 26. In *Barbier* v. *Connolly,* 113 U. S. 27, 31, the court, by Mr. Justice Field, said: "Neither the [fourteenth] amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity. From the very necessities of society, legislation of a special character, having these objects in view, must often be had in certain districts, such as for draining marshes and irrigating arid plains. Special burdens are often necessary for general benefits—

for supplying water, preventing fires, lighting districts, cleaning streets, opening parks, and many other objects. Regulations for these purposes may press with more or less weight upon one than upon another, but they are designed, not to impose unequal or unnecessary restrictions upon any one, but to promote, with as little individual inconvenience as possible, the general good. Though, in many respects, necessarily special in their character, they do not furnish just ground of complaint if they operate alike upon all persons and property under the same circumstances and conditions. Class legislation, discriminating against some and favoring others, is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if within the sphere of its operation it affects alike all persons similarly situated, is not within the amendment." It seems to us that the considerations to which we have adverted in *New York Central R. R. Co.* v. *White, supra,* as showing that the Workmen's Compensation Law of New York is not to be deemed arbitrary and unreasonable from the standpoint of natural justice, are sufficient to support the State of Washington in concluding that the matter of compensation for accidental injuries with resulting loss of life or earning capacity of men employed in hazardous occupations is of sufficient public moment to justify making the entire matter of compensation a public concern, to be administered through state agencies. Certainly the operation of industrial establishments that in the ordinary course of things frequently and inevitably produce disabling or mortal injuries to the human beings employed is not a matter of wholly private concern. It hardly would be questioned that the State might expend public moneys to provide hospital treatment, artificial limbs, or other like aid to persons injured in industry, and homes or support for the widows and orphans of those killed. Does direct compensation stand on a less secure ground? A

familiar exercise of state power is the grant of pensions to disabled soldiers and to the widows and dependents of those killed in war. Such legislation usually is justified as fulfilling a moral obligation or as tending to encourage the performance of the public duty of defense. But is the State powerless to compensate, with pensions or otherwise, those who are disabled, or the dependents of those whose lives are lost, in the industrial occupations that are so necessary to develop the resources and add to the wealth and prosperity of the State? A machine as well as a bullet may produce a wound, and the disabling effect may be the same. In a recent case, the Supreme Court of Washington said: "Under our statute the workman is the soldier of organized industry accepting a kind of pension in exchange for absolute insurance on his master's premises." *Stertz* v. *Industrial Insurance Commission,* 91 Washington, 588, 606. It is said that the compensation or pension under this law is not confined to those who are left without means of support. This is true. But is the State powerless to succor the wounded except they be reduced to the last extremity? Is it debarred from compensating an injured man until his own resources are first exhausted? This would be to discriminate against the thrifty and in favor of the improvident. The power and discretion of the State are not thus circumscribed by the Fourteenth Amendment.

Secondly, is the tax or imposition so clearly excessive as to be a deprivation of liberty or property without due process of law? If not warranted by any just occasion, the least imposition is oppressive. But that point is covered by what has been said. Taking the law, therefore, to be justified by the public nature of the object, whether as a tax or as a regulation, the question whether the charges are excessive remains. Upon this point no particular contention is made that the compensation allowed is unduly large; and it is evident that unless it be

so the corresponding burden upon the industry cannot be regarded as excessive if the State is at liberty to impose the entire burden upon the industry. With respect to the scale of compensation, we repeat what we have said in, *New York Central R. R. Co.* v. *White*, that in sustaining the law we do not intend to say that any scale of compensation, however insignificant on the one hand or onerous on the other, would be supportable, and that any question of that kind may be met when it arises.

Upon the third question—the distribution of the burden—there is no criticism upon the act in its details. As we have seen, its fourth section prescribes the schedule of contribution, dividing the various occupations into groups, and imposing various percentages evidently intended to be proportioned to the hazard of the occupations in the respective groups. Certainly the application of a proper percentage to the pay-roll of the industry cannot be deemed an arbitrary adjustment, in view of the legislative declaration that it is "deemed the most accurate method of equitable distribution of burden in proportion to relative hazard." It is a matter of common knowledge that in the practice of insurers the pay-roll frequently is adopted as the basis for computing the premium. The percentages seem to be high; but when these are taken in connection with the provisions requiring accounts to be kept with each industry in accordance with the classification, and declaring that no class shall be liable for the depletion of the accident fund from accidents happening in any other class, and that any class having sufficient funds to its credit at the end of the first three months or any month thereafter is not to be called upon, it is plain that, after the initial payment, which may be regarded as a temporary reserve, the assessments will be limited to the amounts necessary to meet actual losses. As further rebutting the suggestion that the imposition is exorbitant or arbitrary, we should accept the declaration of intent that

the fund shall ultimately become neither more nor less than self-supporting, and that the rates are subject to future adjustment by the legislature and the classifications to rearrangement according to experience, as plain evidence of an intelligent effort to limit the burden to the requirements of each industry.

We may conveniently answer at this point the objection that the act goes too far in classifying as hazardous large numbers of occupations that are not in their nature hazardous. It might be sufficient to say that this is no concern of plaintiff in error, since it is not contended that its businesses of logging timber, operating a logging railroad, and operating a sawmill with power-driven machinery, or either of them, are non-hazardous. *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 544. But further, the question whether any of the industries enumerated in § 4 is non-hazardous will be proved by experience, and the provisions of the act themselves give sufficient assurance that if in any industry there be no accident there will be no assessment, unless for expenses of administration. It is true that, while the section as originally enacted provided for advancing the classification of risks and premium rates in a particular establishment shown by experience to be unduly dangerous because of poor or careless management, there was no corresponding provision for reducing a particular industry shown by experience to be included in a class which imposed upon it too high a rate. This was remedied by the amendment of 1915, quoted in the margin, above, which, however, cannot affect the decision of the present case. But in the absence of any particular showing of erroneous classification—and there is none—the evident purpose of the original act to classify the various occupations according to the respective hazard of each is sufficient answer to any contention of improper distribution of the burden amongst the industries themselves.

There remains, therefore, only the contention that it is inconsistent with the due process and equal protection clauses of the Fourteenth Amendment to impose the entire cost of accident loss upon the industries in which the losses arise. But if, as the legislature of Washington has declared in the first section of the act, injuries in such employments have become frequent and inevitable, and if, as we have held in *New York Central R. R. Co.* v. *White,* the State is at liberty, notwithstanding the Fourteenth Amendment, to disregard questions of fault in arranging a system of compensation for such injuries, we are unable to discern any ground in natural justice or fundamental right that prevents the State from imposing the entire burden upon the industries that occasion the losses. The act in effect puts these hazardous occupations in the category of dangerous agencies, and requires that the losses shall be reckoned as a part of the cost of the industry, just like the pay-roll, the repair account, or any other item of cost. The plan of assessment insurance is closely followed, and none more just has been suggested as a means of distributing the risk and burden of losses that inevitably must occur, in spite of any care that may be taken to prevent them.

We are clearly of the opinion that a State, in the exercise of its power to pass such legislation as reasonably is deemed to be necessary to promote the health, safety, and general welfare of its people, may regulate the carrying on of industrial occupations that frequently and inevitably produce personal injuries and disability with consequent loss of earning power among the men and women employed, and, occasionally, loss of life of those who have wives and children or other relations dependent upon them for support, and may require that these human losses shall be charged against the industry, either directly, as is done in the case of the act sustained in *New York Central R. R. Co.* v. *White, supra,* or by publicly adminis-

tering the compensation and distributing the cost among. the industries affected by means of a reasonable system of occupation taxes. The act cannot be deemed oppressive to any class of occupation, provided the scale of compensation is reasonable, unless the loss of human life and limb is found in experience to be so great that if charged to the industry it leaves no sufficient margin for reasonable profits. But certainly, if any industry involves so great a human wastage as to leave no fair profit beyond it, the State is at liberty, in the interest of the safety and welfare of its people, to prohibit such an industry altogether.

To the criticism that carefully managed plants are in effect required to contribute to make good the losses arising through the negligence of their competitors, it is sufficient to say that the act recognizes that no management, however careful, can afford immunity from personal injuries to employees in the hazardous occupations, and prescribes that negligence is not to be determinative of the question of the responsibility of the employer or the industry. Taking the fact that accidental injuries are inevitable, in connection with the impossibility of foreseeing when, or in what particular plant or industry they will occur, we deem that the State acted within its power in declaring that no employer should conduct such an industry without making stated and fairly apportioned contributions adequate to maintain a public fund for indemnifying injured employees and the dependents of those killed, irrespective of the particular plant in which the accident might happen to occur. In short, it cannot be deemed arbitrary or unreasonable for the State, instead of imposing upon the particular employer entire responsibility for losses occurring in his own plant or work, to impose the burden upon the industry through a system of occupation taxes limited to the actual losses occurring in the respective classes of occupation.

The idea of special excise taxes for regulation and rev-

enue proportioned to the special injury attributable to the activities taxed is not novel. In *Noble State Bank* v. *Haskell*, 219 U. S. 104, this court sustained an Oklahoma statute which levied upon every bank existing under the laws of the State an assessment of a percentage of the bank's average deposits, for the purpose of creating a guaranty fund to make good the losses of depositors in insolvent banks. There, as here, the collection and distribution of the fund were made a matter of public administration, and the fund was created not by general taxation but by a special imposition in the nature of an occupation tax upon all banks existing under the laws of the State. In *Hendrick* v. *Maryland*, 235 U. S. 610, 622, and *Kane* v. *New Jersey*, 242 U. S. 160, 169, we sustained laws, of a kind now familiar, imposing license fees upon motor vehicles, graduated according to horse power, so as to secure compensation for the use of improved roadways from a class of users for whose needs they are essential and whose operations over them are peculiarly injurious. And see *Charlotte, Columbia & Augusta R. R. Co.* v. *Gibbes*, 142 U. S. 386, 394–5, and cases cited. Many of the States have laws protecting the sheep industry by imposing a tax upon dogs in order to create a fund for the remuneration of sheep-owners for losses suffered by the killing of their sheep by dogs. And the tax is imposed upon all dog-owners, without regard to the question whether their particular dogs are responsible for the loss of sheep. Statutes of this character have been sustained by the state courts against attacks based on constitutional grounds. *Morey* v. *Brown*, 42 N. H. 373, 375; *Tenney, Chairman,* v. *Lenz*, 16 Wisconsin, 566; *Mitchell* v. *Williams*, 27 Indiana, 62; *Van Horn* v. *People*, 46 Michigan, 183, 185, 186; *Longyear* v. *Buck*, 83 Michigan, 236, 240; *Cole* v. *Hall, Collector*, 103 Illinois, 30; *Holst* v. *Roe*, 39 Ohio St. 340, 344; *McGlone, Sheriff,* v. *Womack*, 129 Kentucky, 274, 283 *et seq.*.

We are unable to find that the act, in its general features, is in conflict with the Fourteenth Amendment. Numerous objections are urged, founded upon matters of detail, but they call for no particular mention, either because they are plainly devoid of merit, are covered by what we have said, or are not such as may be raised by plaintiff in error.

Perhaps a word should be said respecting a clause in § 4 which reads as follows: "It shall be unlawful for the employer to deduct or obtain (*sic*) any part of the premium required by this section to be by him paid from the wages or earnings of his workmen or any of them, and the making or attempt to make any such deductions shall be a gross misdemeanor." If this were to be construed so broadly as to prohibit employers and employees, in agreeing upon wages and other terms of employment, from taking into consideration the fact that the employer was a contributor to the state fund, and the resulting effect of the act upon the rights of the parties, it would be open to serious question whether as thus construed it did not interfere to an unconstitutional extent with their freedom of contract. So far as we are aware the clause has not been so construed, and on familiar principles we will not assume in advance that a construction will be adopted such as to bring the law into conflict with the Federal Constitution. *Bachtel* v. *Wilson*, 204 U. S. 36, 40; *Plymouth Coal Co.* v. *Pennsylvania*, 232 U. S. 531, 546.

*Judgment affirmed.*

THE CHIEF JUSTICE, MR. JUSTICE MCKENNA, MR. JUSTICE VAN DEVANTER and MR. JUSTICE MCREYNOLDS dissent.