I dissent from the judgment of the court, and, in declaring my reasons for my dissent, shall take no notice of the claim that the statute is retroactive in its operation. Whatever unconstitutionality may exist on that ground will be speedily cured by the lapse of *Page 57 
time, and I shall therefore address myself to the larger question of the violation of due process.
The immediate and inevitable effect of the recent amendment to Section 1465-75, General Code, is to require solvent employers to compensate industrial accidents to employes of insolvent employers, to require solvent employers to pay a larger semiannual payment into the fund, and to submit to a larger premium rate, because certain employers neglect and refuse to contribute to the fund and escape direct responsibility for industrial accidents on the ground of insolvency.
It should be stated at the outset that no one at this time, after fourteen years experience with workmen's compensation, questions the beneficence of its provisions, and no one denies the authority of the state in the exercise of the police power to impose assessments and by civil process collect from solvent employers such ratable sums as will provide a reasonable insurance fund to compensate industrial accidents. Numerous cases have been decided by the courts of last resort of the states of the Union, and by the Supreme Court of the United States, which fully establish the constitutionality of such statutes, but no court, so far as the reported decisions disclose, has ever been called upon to decide whether or not solvent employers can be compelled to respond for the delinquencies of insolvent employers.
I regard the judgment in this case and the opinion in support of it to be morally, economically, logically, and legally unsound. We are of course only concerned with its legal unsoundness. The authorities cited are the leading authorities which have *Page 58 
heretofore been cited in numerous cases decided by this court and other courts to sustain the constitutionality of workmen's compensation, and they are pertinent, cogent authorities upon that proposition, but it is difficult to see how they have any bearing upon the new question presented herein, as to the right by legislative fiat to disburse funds created by certain employers to pay benefits to injured workmen of other employers who have no part or interest in such fund.
No one contends that the state insurance fund belongs to the employers. It is a trust fund created for the benefit of certain persons, and the only question is as to who are or may be made proper beneficiaries of that fund. If the fund does not belong to the employers, a fortiori it does not belong to the state. No part of it has been raised by taxation. The state has no rights in it and no control over it except the right under a proper exercise of the police power to provide for the creation of a commission to administer the fund. So long as the fund is administered for the benefit of workmen of employers who have contributed to the fund, it has every characteristic and quality of insurance, but, when distributed in part to persons who have no interest in the fund, and who have not contributed directly or indirectly to it, it partakes of the nature of a charity. Workmen's compensation as heretofore administered is in no sense a charity, but, on the other hand, is an insurance, which is justified on the theory that the burdens of industrial accidents should be charged against the industries whose hazards have created the burdens. *Page 59 
The case of Noble State Bank v. Haskell, 219 U.S. 104,31 S.Ct., 186, 55 L.Ed., 112, 32 L.R.A., (N.S.), 1062, Ann. Cas., 1912A, 487, does not support the decision in this case; neither does the quotation from page 110 of the opinion (31 S.Ct., 187) have any relation to the legal issues presented in the instant case. The statement of Mr. Justice Holmes concerning a comparatively insignificant taking of private property does not refer to the amount and value of the property taken, but wholly to the question whether the property taken is for a private use. The issue in the Haskell case was whether an assessment could be levied upon all the banks in the state of Oklahoma to provide a fund to reimburse depositors of insolvent banks. All banks without exception were contributors to the guaranty fund, but naturally only depositors of banks which afterward became insolvent could be beneficiaries. This is a perfect analogy to the fact that only injured workmen can be beneficiaries, while it might happen that some employers who were contributors to the fund might be fortunate in having none of their workmen injured. That decision was further based upon the proposition that the police power of a state extends to the regulation of banking business, even to its prohibition, except on such conditions as the state may prescribe. By federal statute, and by the statutes of every state in the Union, the banking business has been by legislative fiat impressed with a public use, and banks everywhere are subjected to inspection and regulation. This is not true of employers in those lines of commercial endeavor which have not been impressed with a public use. Mr. Justice *Page 60 
Holmes cites the following cases in support of his declaration relative to comparatively insignificant taking: Clark v. Nash,198 U.S. 361, 25 S.Ct., 676, 49 L.Ed., 1085, 4 Ann. Cas., 1171; Strickley v. Highland Boy Gold. Mining Co.,200 U.S. 527, 26 S.Ct., 301, 50 L. Ed., 581, 4 Ann. Cas., 1174; Offield
v. N.Y., N. H. H. Rd. Co., 203 U.S. 372, 27 S.Ct., 72,51 L.Ed., 231; Bacon v. Walker, 204 U.S. 311,27 S. Ct., 289, 51 L.Ed., 499. Every one of these cases relates to the subject of the right to take private property for uses which were argued to be private uses. In not a single one did it appear that the case turned upon questions of the amount and value of the property taken, but wholly upon the question of whether the same was taken for private use. Mountain Timber Co.
v. Washington, 243 U.S. 219, 37 S.Ct., 260, 61 L.Ed., 685, Ann. Cas. 1917D, 642, was one of the leading cases upholding the constitutional validity of workmen's compensation laws, as measured by the due process clause, but we have read the opinion in that case in vain to find anything which declares that there need not be a quid pro quo. The same is true of NewYork Central Rd. Co. v. White, 243 U.S. 188, 37 S.Ct., 247,61 L.Ed., 667, L.R.A., 1917D, 1, Ann. Cas., 1917D, 629. That case upheld the constitutional validity of the New York Workmen's Compensation Law, while the case of Mountain TimberCo. v. Washington, supra, upheld similar provisions in the Workmen's Compensation Law of the state of Washington. The reasoning in both opinions is along similar lines, and has no bearing whatever upon the question of the inviolability of a trust fund. Another case cited is that of Jeffrey Mfg. *Page 61 Co. v. Blagg, 235 U.S. 571, 35 S.Ct., 167, 59 L.Ed., 364. That case involved an interpretation of the Ohio Workmen's Compensation Act, and the only question involved was whether the act was discriminatory in withholding the defenses of assumed risk and contributory negligence as to employers having more than five employes, who refused to comply with the provisions of the act, inasmuch as those defenses were still open to an employer having less than five employes. The only important question decided by the court was the one question of discrimination. In the course of the opinion it was stated that much of the argument in behalf of the employer was based upon the supposed wrongs to the employe. The court then proceeded to declare that, inasmuch as no employe was complaining of the act, injustice to the employe could not be urged on behalf of the employer, and that it is a well-settled rule of the court that it will only hear objections to the constitutionality of laws from those who are themselves affected by the alleged unconstitutionality of the features complained of. There can be no argument upon this well-settled proposition. It cannot, however, be applied to the instant case, because the defense is here made by the Industrial Commission, which is created as a trustee to administer the fund and to guard it against depletion and attacks upon the fund by those who are not entitled to its benefits. To say that the Industrial Commission may not raise this question would be equivalent to saying that the Industrial Commission may not resist the payment of any claims made against the fund upon any ground. The foregoing constitute all of the *Page 62 
adjudicated cases which have been cited in support of the judgment. Surely nothing more need be said to show their inapplicability and their want of value in the determination of the legal issues involved in this case. It is further stated in the opinion that "the Attorney General in his brief seems to concede that our workmen's compensation scheme would be endangered." We are unable to find any such concession. It must be apparent that the workmen's compensation scheme is placed in greater peril by violation of the fund than by safely guarding it.
If a statute which permits the fund to be applied to the payment of claims of injured workmen whose employers do not contribute to the fund is valid and constitutional, then by the same token it would be constitutional to permit the wages of employes of insolvent and noncontributing employers to be paid out of a fund created for such purpose by assessments levied upon solvent and contributing employers. The instant case does not turn upon the soundness and validity of workmen's compensation laws. It turns upon the character of the state insurance fund, upon whether or not that fund can be diverted from the uses for which it was provided, and upon whether or not it can be distributed to benefit persons who had no part in creating it.
It is apparently the basis of the opinion that the taking from the fund to pay the claims of employes of insolvent employers is "comparatively insignificant." Neither the due process clause of the Fourteenth Amendment to the federal Constitution nor Section 19 of the Ohio Bill of Rights *Page 63 
measures the amount and value of the taking. It is not provided in either of those constitutions that nearly all of the property of the citizen shall be held inviolate, but, on the contrary, it is provided that "private property shall ever be held inviolate," meaning of course all private property without regard to value, and that all questions of value are for the determination of the jury and not for the arbitrary determination of a court which may by some course of reasoning conceive the same to be "comparatively insignificant."
It is further stated in the opinion that it cannot be determined in advance that the fund will ever suffer a loss by such advancements; that there is always the possibility that the money may be recovered from the insolvent employer. It is a complete answer to this proposition that an enforced loan is in no wise different from a compulsory taking.
The legal question involved being in its last analysis one of due process, and the claims of counsel in this case being in large measure grounded upon the claim that it is only a loan of the funds, it becomes important to look into the fundamental causes out of which the doctrine of due process has evolved. Prior to 1628, the English monarchs had a pernicious habit of borrowing money from English nobles for the purpose of maintaining a navy, such loans being called "ship money," the same being necessary because, while the military forces could be maintained under feudal practices, there was no means of raising money to maintain a navy except by loans called ship money. It was found to be exceedingly unhealthy for a wealthy *Page 64 
nobleman to refuse to make such a loan. On the other hand, it was the universal experience that such loans were never repaid. In the reign of Charles the First, in 1628, parliament enacted a law known as the "Petition of Right." This law declared, among other things, that forced loans should no longer be demanded by the king, without the consent of parliament. Charles the First was compelled to give his assent on June 7, 1628. Having repeatedly violated his promise, he was impeached 20 years later and sent to the block, and Cromwell became protector. In 1689, during the reign of William and Mary, the crown was compelled to accept a more elaborate declaration, called the "Bill of Rights," which incorporated practically all the provisions which have been carried into the Bills of Rights of the Constitutions of the United States and of various states. The English declaration of 1689 became the foundation stone of the doctrine of due process as declared and enforced in American jurisprudence, and the Fifth Amendment to the federal Constitution and Section 19 of the Ohio Bill of Rights are the embodiment of the principle that property cannot be taken without due process, and it is at least significant that that just and well-settled principle had its origin in the iniquity of forced loans.
The law which would take from solvent contributors to the state insurance fund to pay benefits to insolvent employers is unsound from an economic standpoint. The very law which was found to be legally constitutional in Noble State Bank v.Haskell, supra, was after only a few years experience repealed, because it so far encouraged *Page 65 
speculation in banking that it defeated the very purpose which was sought to be served. Kansas, Texas, and other states tried the same experiment with like experience, resulting in repeals.
DAY and ROBINSON, JJ., concur in this dissenting opinion.
KINKADE, J., concurs in the conclusions reached in the dissenting opinion.