INDEPENDENT SERVICE CORPORATION v. TOUSANT et al., Members of Industrial Accident Board.

No. 4034.

Circuit Court of Appeals, First Circuit.
May 4, 1945.

4 White-Smith Music Pub. Co. v. Apollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L. Ed. 655, 14 Ann.Cas. 628; Holmes v. Hurst, 174 U.S. 82, 19 S.Ct. 606, 43 L. Ed. 804.

Edward C. Park, of Boston, Mass., and Philip F. Grogan, of Watertown, Mass. (Withington, Cross, Park & McGann, of Boston, Mass., of counsel), for appellant.

William Gardner Perrin, Asst. Atty. Gen., of Massachusetts (Clarence A. Barnes, Atty. Gen., of Massachusetts, of counsel), for appellees.

Maurice M. Goldman, of Boston, Mass., for Massachusetts State Federation of Labor, amicus curiæ.

Before MAHONEY and WOODBURY, Circuit Judges, and PETERS, District Judge.

MAHONEY, Circuit Judge.

This action involves the constitutionality of a Massachusetts statute. It was brought to enjoin the enforcement of § 25D of the Workmen's Compensation Act, Chapter 152, Gen. Laws of Massachusetts (Ter. Ed.), as amended by St.1943, c. 529, § 7, which provides:

"No self-insurer or attorney acting in its behalf shall engage a service company or like organization to investigate, adjust, or settle claims under this chapter or to represent it in any matter before the department. Any violation of this section shall constitute reasonable cause for revocation of the license of a self-insurer under section twenty-five A of this chapter."

Since November 15, 1943, the effective date of § 25D, the plaintiff has refrained from investigating, adjusting or settling claims for self-insurers, and the Industrial Accident Board has made it clear that it would revoke the license of any self-insurer who employed a service company to engage in such activities under the Act. As a result the plaintiff has lost contracts with self-insurers which would net it $2000 a year. It alleges that § 25D deprives it of liberty and property in violation of the Fourteenth Amendment.

The plaintiff, a Massachusetts corporation, was organized in 1936 as a "service company" to do safety engineering and statistical work. It investigated industrial accidents and advised employers as to methods and appliances designed to prevent such accidents. Among its clients were employers electing not to insure under the Workmen's Compensation Act, insurance companies, and clients in public liability cases and casualty losses. Its contracts with non-insuring employers provided for the investigating of industrial accidents and the adjusting and settling of those claims. Those contracts alone fall within the prohibition of § 25D. There is no question but that the plaintiff may continue to do safety engineering and statistical work and to investigate industrial accidents for the purpose of preventing future accidents and arranging for medical care required by past accidents.

As originally enacted in 1911, the Massachusetts Workmen's Compensation Act, as those adopted in other states about that time, was an elective compensation insurance law. In theory it was compulsory upon no one, neither employer, employee, nor insurer. Though elective in form it exerted pressure upon employers to carry compensation insurance by depriving them of certain of their common law defenses in actions brought by employees for personal injury. Since the Act was elective and not compulsory employers could refuse to take out workmen's compensation insurance. Those employers thereby avoided the cost of insurance premiums which some regarded as too high in relation to the risks involved but retained their common law liability. Some employers who were willing to provide compensation benefits to their employees similar to those they would receive from an insurer under the Act, but directly out of the employers' funds, developed substitute plans. Under these plans the employer carrying his own risk either provided for the investigating, adjusting and settling of claims within his own organization or employed a service company to do it for him. To insure savings the plans provided for the purchase of some form of stop-loss insurance which would indemnify the employer for any losses or claims paid which exceed a certain percentage of the amount he would have to pay for ordinary workmen's compensation insurance. The figure fixed is usually 75% of that premium, and thereby the employer immunizes himself against his common law liability. Thus the employer setting up a substitute plan is in a position to limit his maximum cost to that of workmen's compensation under the Act, and to the extent that the total costs of the service company, losses on claims paid, and the stop-loss insurance premium is less than the normal compensation insurance premium he makes savings and reduces the costs of workmen's compensation. For ex-

206

ample, if we take 100% as the cost of the normal premium the common allocation of costs under the substitute plan may be illustrated as follows: 10% for the service company, 15% for the stop-loss insurance premium, and 75% for the payment of losses. As the latter item is the largest the employer looks to it for savings, and to the extent that the service company keeps the amount of claims paid below the maximum figure not covered by stop-loss insurance the employer makes savings and the service company function is economically justified.

In 1943 the legislature enacted Chapter 529 adding § 25A through § 25D to the Act. This chapter in effect converts the Act from an elective compensation insurance law into a compulsory one by making the provision of workmen's compensation mandatory with practically all employers. The employer, however, has an option in meeting the costs of compensation either of taking out insurance or acting as his own insurer. § 25A through § 25C provide for the compulsory payment of compensation by insurance unless the employer elects to become a "self-insurer" under the Act. This he may do by obtaining a license from the Industrial Accident Board and complying with certain requirements respecting the furnishing of security for the payment of compensation to injured employees. The effect of this chapter with respect to the former non-insuring clientele of the plaintiff service company is to bring them and their employees within coverage of the Act but does not require such employers to purchase workmen's compensation insurance. They may continue to finance the payment of workmen's compensation out of their own funds, but § 25D precludes their continued reliance on service companies· such as the plaintiff in the investigating, adjusting and settling of claims.

The question to be decided is whether the provisions of § 25D prohibiting contracts between self-insurers and service companies is a reasonable exercise of police power. The plaintiff argues that the statute is arbitrary and discriminatory. It takes the position that it was pursuing a lawful calling and argues that there is no rational ground for believing that it was reasonably necessary to prohibit self-insurers from employing service companies to accomplish the purposes of the Act as regulation would serve.

In an exhaustive opinion, the lower court considered the plaintiff's arguments. Independent Service Corporation v. Tousant, D. C., 56 F.Supp. 75. Approaching the question from the standpoint of legislative power over employers who do not have policies of insurance complying with the Act, it noted that it is now well settled that the State has power to create a compulsory insurance system to secure adequate compensation to workmen for industrial accidents [1]; that instead of exercising that power to the full, the State may choose to allow the employer to remain outside the coverage of the Act providing that he gives up certain relevant rights [2]; that since the legislature can deprive the non-insuring employer of his right to protect himself from liability by securing insurance which does not provide for the payment of compensation benefits [3] "It is no great step from depriving an employer of his right to insure as he pleases to depriving him of his right to use a service company to investigate, adjust or settle claims of employees under the Workmen's Compensation Act." [56 F.Supp. 80]. The court below found some authorities who regarded service companies as proper and useful adjuncts to the administration of workmen's compensation and others who regarded them as detrimental to the interest of employees and the system as a whole. Of the latter it said:

"They assert that a service company plan can survive only if the employer pays out less in settlements than he would have to pay as a premium to an insurance company; that the service company is therefore under an economic inducement to pay workmen low amounts as compensa-

[1] New York Central R. v. White, 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667, L.R.A.1917D, 1, Ann.Cas.1917D, 629; · Mountain Timber Co. v. Washington, 243 U.S. 219, 37 ·S.Ct. 260, 61 L.Ed. 685, Ann.Cas. 1917D, 642; Thornton v. Duffy, 254 U. S. 361, 41 S.Ct. 137, 65 L.Ed. 304.

[2] Such as his common law defenses.

New York Central R. v. White, supra; Young v. Duncan, 218 Mass. 346, 106 N. E. 1; Opinion of the Justices, 309 Mass. 571, 595, 596, 34 N.E.2d 527.

[3] Alecks' case, 301 Mass. 403, 17 N.E.2d 173; Opinion of the Justices, 309 Mass. 596, 34 N.E.2d 527.

tion for their injuries; that this economic inducement is not counterbalanced as in the case of lawyers by the professional discipline of the bar, or as in the case of insurance companies by the supervision of public authorities, or as in the case of settlement departments of the employer's own business by neighborly sympathy and longstanding ties of mutual interest; and that the low payments under a service company plan not only prevent employees from getting uniform and hence fair compensation but also induce employers either not to join or to withdraw from a broad insurance scheme which would diversify and spread risks and would improve the administration and effectiveness of the Workmen's Compensation Act."

The court was of the opinion that in the light of the legislative materials and professional authorities before it the legislature could reasonably conclude that the use of service companies by self-insurers precluded workmen from receiving adequate compensation under the Act. Therefore it held that the legislature "was not limited to an enactment which merely regulated the use of service companies by self-insurers; it had the power absolutely to prohibit their use," citing Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Powell v. Pennsylvania, 127 U.S. 678, 685, 686, 8 S.Ct. 992, 1257, 32 L.Ed. 253; Cf. United States v. Carolene Products, 304 U.S. 144, 151, 58 S.Ct. 778, 82 L.Ed. 1234.

The plaintiff contends that the lower court erred in failing to distinguish between self-insurers under a compulsory act and non-insurers under an elective act and asserts that the only criticism of service companies before the legislature was directed at their use by non-insurers and is without any relevancy whatsoever with respect to their use by self-insurers under a compulsory act. The plaintiff further contends that the enactment of § 25D rests on the assumption on the part of the legislature that adjustments made by service companies for self-insurers quali-fied as such under § 25A of the Act would not be subject to the Act and to the supervision of the Industrial Accident Board. We see no merit in these contentions.

■ In our opinion the analysis of the District Court was correct. It is apparent from legislative history prior to November 15, 1943, the effective date of § 25D, that the use of substitute compensation plans which combined the use of service companies in the investigating, adjusting and settling of claims with stop-loss insurance putting a ceiling upon employers' losses had been receiving considerable attention from the legislature. Furthermore we are satisfied that the criticism of service companies was not directed solely at their use by non-insurers outside the Act. In 1935 § 54A was added voiding stop-loss insurance policies which did not provide for the payment of compensation under the Act, and it was well understood that if this amendment had succeeded in forcing employers to carry workmen's compensation insurance the business of service companies to that extent would have been circumscribed.[4] In 1938 the Attorney General acted on complaints of abuses being practised by service companies, and in his report for the year ending November 30, 1938, Public Document No. 12, pp. 8, 9, it was stated that to sell their services service companies promise that the total amount paid to employees will not exceed the amount of premiums the employer would otherwise have to pay if he took out ordinary workmen's compensation insurance; that they try to get injured workers to sign away their rights for the smallest amount possible, and that workers are generally forced to settle at very low figures, for if they sue at common law they risk losing their positions since the employer must meet adverse judgments out of his own funds and not an insurance company. The legislature had this report before it when it was considering the enactment of § 25D. It also had before it an article in 18 Boston University Law Review 1 (1938), which

---

[4] St.1935, c. 425. In Aleck's Case, supra, the Supreme Judicial Court states that the reasons for § 54A are plain and points out that the willingness of some employers to risk the enlarged liability of the non-insurer to avoid paying premiums would increase if they could obtain at smaller expense liability insurance against the payment of damages in common law actions; and that "Thus the pressure which was intended to drive all employers into insuring under the Workmen's Compensation Act would be removed, and the public policy of the Commonwealth that all employers should come under that act would fail." [301 Mass. 403, 17 N.E.2d 175.]

suggests that the history of the Massachusetts Workmen's Compensation Act from 1911 until the depression began in 1929 was one of gradual expansion of the number of workmen covered, and that after 1929 the trend was reversed with employers in an effort to reduce expenses withdrawing from the Act to escape the cost of premiums.

In 1938 the legislature set up a Special Recess Commission for the purpose of investigating workmen's compensation insurance. The report [5] of that commission contained a majority and minority report on the subject of self-insurance revealing a substantial difference of opinion with respect to service companies. The majority thought that substitute compensation plans provided that service companies "would undertake to keep down the claims for injury in a given plant to a minimum through supervision of safety appliances and efficient and prompt attention to all injuries." It cited testimony that some employers acting outside the Act dealt liberally with employees and paid benefits substantially the same as those provided under the Act and that both employers and employees seemed satisfied. It merely acknowledged the assertion "that costs were kept down through pressure upon employees not to assert claims, and failure to pay benefits as great as those provided for in the Act." The minority report was far more critical. It provided in part: "When a workman was injured and there was negligence these substitute scheme promoters would then settle with the workers as cheaply as possible under the common law. If there were no negligence, as in 90% of the cases, then they would pay the worker practically nothing, and in many cases nothing, for the loss of a leg or an eye or an arm. Section 54A of the compensation act was passed to stop such substitute schemes. But it did not succeed in doing so. These substitute scheme promoters, therefore, are anxious to have a provision put in the law so that there may be self-insurance, that is, an employer who could pay his workmen directly, and the people who were formerly handling substitute schemes would then be handling the cases for self-insurers." The period between 1938 and 1943 saw the introduction of numerous bills designed to legalize service companies.[6] None of them became law.

In the light of legislative history and the materials on hand when the legislature considered § 25D, we are satisfied that there was a reasonable difference of opinion as to the place of the service company in the scheme of compulsory workmen's compensation, and that the legislature could reasonably conclude that the economic pressure upon service companies to keep compensation payments down was so pressing as to constitute them an appropriate object of prohibition when considered in the light of an established public policy that workmen should receive adequate compensation for injuries. Therefore we are not disposed to upset the conclusion of the legislature that there was something inherently harmful to the interest of workmen in the service company function.

This disposes of the contention of the plaintiff that it was pursuing a lawful calling, the abuse of which it concedes is subject to regulation. It also disposes of the arguments that since the Act is now compulsory and all compensation claims are subject to supervision by the Industrial Accident Board, the Board is in a position to control abuses; and that if further regulation were necessary the legislature could set up direct controls over service companies and subject them to licensing requirements. Irrespective of the theoretical validity of the arguments they do not necessarily meet the actual problem. From the testimony taken at the trial it appears that more than 95% of all workmen's compensation claims even under the amended Act are disposed of without close supervision by the Industrial Accident Board. Apparently it was the judgment of the legislature that the economic pres-

---

[5] Commonwealth of Massachusetts, Senate Report No. 456, February, 1939, Report of the Special Recess Commission appointed for the purpose of investigating Workmen's Compensation, Silicosis, and Hazardous Employments, pp. 8–10, 25, 26.

[6] House Bill No. 1765 of 1941 providing for legalization of service companies; House Bill No. 2038 of 1941 which would repeal section 54A and permit the issuance of stop-loss insurance policies; House Bills No. 2818 of 1941 and No. 1030 of 1943 permitting stop-loss insurance; a substitute proposal identified as House No. 0000, May 4, 1943, expressly legalizing service companies was considered with open hearings by the Committee which reported out the bill that upon enactment became § 25D.

sure upon service companies to keep the payments of losses down could not be restrained through regulation by the Industrial Accident Board since the latter dealt primarily with flagrant abuses and would not be a satisfactory control in the great mass of compensation cases.

Nor does the fact that insurance companies apparently may employ service companies without restriction necessarily indicate that § 25D is capricious. Insurance companies are subject to close and complete supervision. Moreover, the profit motive and fear of losses are less apparent. The insurance company may be prepared to pay compensation to the employees of one employer which exceeds the particular premium charged and make up its loss on other risks where compensation payments are less than premiums. It is also to be noted that premium rates are not fixed but adjustable according to loss experience of the risk.

■ It is clear that the State may require contributions to a state fund as the exclusive method of making payments required by a Workmen's Compensation Act, Mountain Timber Co. v. Washington, supra; and that the State as a condition to permitting an employer to make such payments as a self-insurer, may prohibit him from insuring with a private company by requiring him either to contribute to a state fund or to act as his own insurer without the security of private insurance, Thornton v. Duffy, 254 U.S. 361, 41 S.Ct. 137, 65 L.Ed. 304. The present act gives the employer the option of taking out ordinary workmen's compensation insurance or of acting as his own insurer. As a condition to obtaining a license as a self-insurer the Act provides that such self-insurer must not employ a service company. The plaintiff's final contention is that the legislature has forbidden employers to contract with service companies for the purpose of ultimately driving them to provide for compensation benefits through conventional insurance and that in so doing it has gone too far in abridging freedom of contract. It distinguishes Mountain Timber Co. v. Washington, supra, and Thornton v. Duffy, supra, as dealing with state funds and asserts that the effect of the statute here is to require all employers to insure with private companies. We do not agree.

We have already adverted to materials before the legislature indicating that § 25D was enacted for reasons quite independent of those urged by the plaintiff. Nor are we of the opinion that the practical operation and effect of the statute will exert an unreasonable pressure upon employers to insure with private companies. The plaintiff assumes that service companies are the sine qua non of self-insurance. Yet it will be conceded that the larger employer who maintains his own service department never has to turn to the service company for the investigating, adjusting and settling of claims against him. Nor are we satisfied that the smaller employer who cannot maintain his own service department is foreclosed from acting as a self-insurer. In this connection the decision of the Supreme Judicial Court in Friend Brothers, Inc., v. Seaboard Surety Co., 316 Mass. 639, 56 N.E.2d 6, 9, 153 A.L.R. 962, is to be noted. In that case the court held that § 54A of the Act which made void stop-loss policies taken out by non-insurers was not applicable to such policies issued to self-insurers under the Act and said:

"We do not believe that this statute, which, as pointed out in Alecks' case, supra, was for the purpose of compelling employers to insure under the act, was intended, after they had insured their employees by becoming self-insurers, to make it difficult for them to do so by denying them the right to reinsure. Such a construction would impute to the Legislature an intent to discourage self-insurance and to weaken the financial strength of the self-insurer who seeks by reinsurance to increase it for the benefit of himself and his employees. Where a statute such as St.1943, c. 529, makes it compulsory for one to insure his employees and gives him the choice of either insuring with an insurer or acting as a self-insurer, *it would take clear and unequivocal language to convince us that one of these methods was to be regarded with less favor than the other. Such language is not to be found either in c. 529 or in section 54A.*"

Section 25D was a part of c. 529.[7] It

[7] The plaintiff cites the decision in Friend Brothers, Inc. v. Seaboard Surety Co., supra, as showing that all sound reasons for opposing the use of service com-

would also seem therefore that the Supreme Judicial Court was not of the opinion that this section was enacted for the purpose of forcing employers to insure with private companies, or that that would be its only effect.

The judgment of the District Court is affirmed with costs to the appellees in this court.

panies by employers had vanished with the amendment to the Act, making provisions for compensation compulsory but offering employers an option to become self-insurers under the Act.