[No. 33657. *En Banc.* July 9, 1959.]

ESTHER COOPER, *Appellant,* v. THE DEPARTMENT OF LABOR AND INDUSTRIES *et al., Respondents.*[1]

PER CURIAM.—Upon a rehearing *En Banc.,* a majority of the court adhere to the departmental opinion heretofore filed herein and reported in 49 Wn. (2d) 826, 307 P. (2d) 272.

HUNTER, J. (dissenting)—This case was previously decided by a departmental decision reported in 49 Wn. (2d) 826, 307 P. (2d) 272 (1957), and is now before this court as a result of a rehearing *En Banc.* The facts are as follows:

On August 20, 1948, Esther Cooper filed a claim for compensation with the department of labor and industries, under the provisions of the industrial insurance act. In her report of the accident, she alleged:

"While working on planer received shock from machine; then left to carry out a crate to the back of the mill but

[1] Reported in 342 P. (2d) 218.

fell through a crack in the flooring in the doorway, due to passing out on account of shocks. About a week later sustained similar condition due to shocks, have not been able to work since."

On December 30, 1948, the supervisor of industrial insurance rejected her claim on the ground that her condition was not the result of an industrial injury as defined by the workmen's compensation act. She appealed to the then joint board of the department alleging total permanent disability from *injury to her heart* sustained as a result of *a series of electrical shocks* received in the course of her employment. Her claim was denied by the board on May 10, 1955. Thereafter, she appealed this decision of the board to the superior court of Grays Harbor county. The department and the employer moved to dismiss the action on the ground that there was insufficient evidence to sustain a judgment for the claimant. The trial court granted the motion and entered judgment accordingly. The claimant thereafter appealed to this court.

The appellant assigned error to the granting of respondent's motion for dismissal and in striking and refusing to consider certain medical testimony of appellant's expert witness.

Appellant contends she sustained an accumulation of shocks from static electricity which was generated by the friction of pieces of wood rubbing on each other as they went through the planer where she worked, causing her to suffer a heart condition diagnosed as neurocirculatory asthenia or anxiety neurosis, more commonly known as effort syndrome or soldier's heart.

In our departmental opinion, we held that there must be an immediate or prompt result produced by a sudden happening of a traumatic nature to constitute an industrial injury; that there was no immediate or prompt result produced by the separate electrical shocks, and her resulting condition does not come within the statutory provision defining an industrial injury. Rem. Rev. Stat. (Sup.), § 7675. (For present statutory definition, see Laws of 1957, chapter 70, § 12, p. 277.)

I do not agree that compensation for injury under the act is limited to those instances in which there is only a single blow or shock. An injury can result as effectively from an accumulation of a series of blows or shocks as from one. However, in the instant case the evidence is insufficient to establish that an immediate or prompt result was produced from the accumulation of the series of electrical shocks at the conclusion thereof. The appellant's condition, therefore, is not an industrial traumatic injury within the contemplation of the statute.

In the departmental opinion, we concluded that the appellant had made her claim upon the basis of an industrial injury, not an occupational disease, and finding no injury within the meaning of the act, we determined that the judgment of dismissal entered by the trial court should be affirmed. However, on rehearing, the appellant contends that there had been no election between an industrial traumatic injury and an occupational disease and that she is entitled to compensation if her claim can be sustained under either theory.

In *Nelson v. Department of Labor & Industries,* 9 Wn. (2d) 621, 115 P. (2d) 1014 (1941), we said:

" . . . As long as the writing filed with the department reasonably directs its attention to the fact that an injury, with its particulars, has been sustained and that compensation is claimed, the statute has been substantially complied with. In *Kaplan v. Kaplan Knitting Mills,* 248 N. Y. 10, 161 N. E. 204, the court aptly expressed the prevailing judicial attitude regarding workmen's compensation practice:

" 'The Workmen's Compensation Law was particularly framed to avoid legal terminology and the technicalities of law pleading. It was intended that the working people themselves could make and file these claims and give the notice of injury. The cost and expense of employing attorneys were to be avoided if possible. The act was for the benefit of the workingman and his family, not for the profession. The notice, therefore, of injury and the claim for compensation are sufficient when the facts of the injury are stated with reasonable certainty, and it is also reasonably to be inferred that a claim for compensation is being made.' "

The appellant's contention comes within the rule as stated in the *Nelson* case. Her claim directs the department's attention to her alleged resulting condition. We should now, therefore, hold that it was sufficiently broad to support her claim for the department's consideration under either theory—an industrial traumatic injury or an occupational disease.

In considering the appellant's theory of occupational disease, we do not apply the rule essential to establish a traumatic industrial injury, that the cause produce an immediate or prompt result; we apply instead the rule of proximate cause.

In *Favor v. Department of Labor & Industries*, 53 Wn. (2d) 698, 336 P. (2d) 382 (1959), we said:

"On the other hand, the statute relating to occupational disease does not require that the cause produce an immediate or prompt result, as in the injury cases, but it does require that the disease arise 'naturally and proximately' from the employment. The rule of proximate cause has thus been written into our occupational disease statute. As we said in *Simpson Logging Co. v. The Department of Labor & Industries, supra* [32 Wn. (2d) 472, 202 P. (2d) 448 (1949)],

" '. . . The legislature is presumed to have been familiar with the meaning of "proximate cause" as used by the courts, and that being so, when they defined as an occupational disease those diseases or infections as arise naturally and *proximately* out of extrahazardous employment, it would follow that they meant that the condition of the extrahazardous employment must be the proximate cause of the disease for which claim for compensation is made, and that the cause must be proximate in the sense that there existed no intervening independent and sufficient cause for the disease, so that the disease would not have been contracted but for the condition existing in the extrahazardous employment.' "

An occupational disease is defined in RCW 51.08.140 as follows:

" 'Occupational disease' means such disease or infection as arises naturally and proximately out of extrahazardous employment. . . ."

The issue then to be resolved is whether the appellant's alleged resulting condition is an occupational disease as above defined.

Does an analysis of the testimony disclose sufficient competent evidence in the record to submit the case to the jury on this issue? In making this determination, we must apply the further rule that the causal relation between a disabling disease and the workman's employment must be established by medical testimony before the disease can be classed as occupational. *Parr v. Department of Labor & Industries,* 46 Wn. (2d) 144, 278 P. (2d) 666 (1955).

Dr. J. F. Steele, specializing in diseases of the heart and lungs, was the only medical witness to testify for the appellant. He diagnosed her condition as neurocirculatory asthenia or anxiety neurosis, more commonly known as effort syndrome or soldier's heart. He testified:

"I feel that there is a causal relation there. That this person seemed over sensitive to electricity and she had one shock after another, and none of these probably were very high voltage or amperage, but they were enough to worry her to such an extent that it did affect her heart."

He testified further that he noted the following objective symptoms at the time he examined the appellant: She acted exhausted, tired, weak, and orthopnea; she was not able to breathe well lying down; her breathing was forceful and rapid; her heart palpitated upon the slightest exertion; and that it was very apparent she was nervous by the noticeable tremor or trembling. He concluded that the repeated static electrical shocks brought on the neurocirculatory asthenia or nervous state of appellant, and that because of her circulatory condition she was totally disabled. Dr. Steele admitted on cross-examination that he had seen the appellant on only one occasion when he examined her May 1, 1952, and that he had never treated her.

Dr. Steele's testimony concerning the history related to him by the appellant, and his diagnosis and conclusions based upon such history and his examination, were ordered stricken by the superior court on the ground that he had

examined the appellant merely for the purpose of testifying as to her condition and, therefore, was limited in his testimony to objective findings and the answering of hypothetical questions under the rule in *Petersen v. Department of Labor & Industries,* 36 Wn. (2d) 266, 217 P. (2d) 607 (1950), wherein we said:

"If the claimant desires subjective symptoms to be available to him in support of his cause of action, where he has not been treated for them, he must introduce testimony concerning them which can be subjected to cross-examination and rebuttal. Thus, an issue of fact is submitted to the trier of the facts, and expert-opinion answers to hypothetical questions based thereon will stand or fall according to how the issue of fact is resolved. *The doctor who examines the party only for the purpose of qualifying as a witness, is limited in his testimony to objective findings and the answering of hypothetical questions.*" (Italics mine.)

The appellant, however, cites the later case of *Kresoya v. Department of Labor & Industries,* 40 Wn. (2d) 40, 240 P. (2d) 257 (1952). In that case we said:

"We adhere to the rule adopted in the *Cooper case, supra,* [*Cooper v. Department of Labor & Industries,* 20 Wn. (2d) 429, 147 P. (2d) 522 (1944)] and other like cases, and also the rules adopted with reference to the necessity of medical testimony. The rule that an expert medical witness may not base his opinion upon subjective symptoms *alone* is designed to protect the industrial insurance fund against unfounded claims of aggravation. If such claims could be established by the testimony of a physician who based his opinion *entirely* upon what the claimant told him, it would open the door to fraudulent claims, as well as those mistakenly made in good faith. A claimant might honestly believe his subsequent condition arose out of his original injury, but this is a medical question and an opinion thereon must be derived from sources other than the claimant's statement. *These protective rules, however, must not be applied to situations where there is a combination of subjective and objective symptoms,* which an expert may be able to tie together, and we think this is made very clear by a careful reading of the cases we have cited. The physician must of necessity obtain some history from the claimant, and has a right to make proper

use of it in connection with objective findings which he as an expert may make by an examination, the making of tests, the use of X-ray pictures and other proper data." (Italics mine.)

It is to be noted that in the *Kresoya* case, *supra,* we expressly stated, in referring to the well-established rule that an expert medical witness may not base his opinion upon subjective symptoms alone, that this rule does not apply to situations where there is a combination of subjective and objective symptoms which are related. This exception to the general rule, under these circumstances, is inconsistent with the following language in the *Petersen* case, *supra,* "The doctor who examines the party only for the purpose of qualifying as a witness, is limited in his testimony to objective findings and the answering of hypothetical questions." This rules out the consideration of subjective symptoms, even though coupled and related with objective findings. The rule announced by this language in the *Petersen* case, *supra,* was therefore impliedly overruled in the *Kresoya* case, *supra.* We should now, for clarification, expressly overrule the *Petersen* case in so far as it is inconsistent with the rule announced in the *Kresoya* case. In the instant case, a review of the record discloses that the conclusions of Dr. Steele were not based on subjective symptoms *alone* but upon a combination of related subjective and objective symptoms. Thus, this testimony comes within the rule of the *Kresoya* case, and the trial court, therefore, erred in striking it.

Dr. Steele, in addition to the conclusions discussed above, testified in answer to a *hypothetical question* propounded by counsel for the appellant, that there was a causal relationship between the shocks and appellant's condition. The hypothetical question included, among other facts, the subjective symptoms related to the doctor at the time of his examination of the appellant, but concerning which *the appellant had testified under oath and upon which she had been cross-examined.* The trial court properly held such conclusion was admissible.

The respondents contend that, in any event, Dr. Steele's opinion on direct examination lacked probative value, in that it was based on the false assumption that the appellant was in a state of normal good health prior to the alleged series of shocks.

While it is true that Dr. Steele, on cross-examination, did state that he based his opinion on the assumption that the appellant, prior to the shocks, was in normally good health, he was thereafter asked by counsel for the respondent-employer the following hypothetical question:

"Now, Doctor, assuming that prior to the time that this alleged accident that this lady was a very highly nervous, excitable woman and that she had had considerable trouble with her family. That she had had hallucinations, that her son, who was living with her was going to kill her. That she had taken knives out of his bed, or claimed she did, on numerous different occasions and thrown them in the river, and that upon, at least one occasion, she was out at the plant working and when her foreman went by her machine she was crying, hysterical, and he asked her what was the matter and she related the facts that I just stated. That she was scared to death that her boy was going to kill her, and that in the next few days she brought to the mill, where she was working, 2 knives, and gave them to the foreman, stating that these knives she took out of her boy's bed and if anything happened to her, he would know what happened.

"If she was in that kind of condition prior, a long time prior to this accident, would that in itself have any bearings upon your diagnosis? A. *It wouldn't change my diagnosis, no.* It would give some reason for her being such a highly nervous temperament." (Italics mine.)

In answering further questions, he consistently adhered to his opinion of causal relationship.

Reviewing the testimony of Dr. Steele in the light most favorable to the appellant (*Sawyer v. Department of Labor & Industries,* 48 Wn. (2d) 761, 296 P. (2d) 706 (1956), and cases cited therein), we must hold that if there was any false assumption upon which he initially based his conclusions on direct examination that that assumption was removed, and any deficiency that may have existed

was cured by the amplification of the questions in the exhaustive cross-examination conducted by respondent-employer counsel. Dr. Steele's testimony, taken in its entirety with the reasonable inferences to be drawn therefrom, is sufficient to warrant submission to the jury of the issue of causal relationship between the alleged series of shocks and appellant's existing condition. There is medical testimony in the record to the effect that appellant's condition was the same in 1942 as it was in 1952, but the *fact* remains that the appellant did work for certain periods between 1942 and 1948, and upon examination in 1952, Dr. Steele found the appellant to be totally disabled. It is within the province of the jury to determine, in the light of all the evidence, whether appellant's condition was caused by her employment.

The trial court was correct, however, in ruling out evidence to be considered by the jury in the testimony of Dr. Steele, in his reiterating the history related to him by the appellant. This was hearsay. *Kresoya v. Department of Labor & Industries, supra.*

In dismissing this action for failure of medical testimony to prove causation, the trial court, in addition to relying upon the *Petersen* case, *supra,* relied upon the case of *Hyde v. Department of Labor & Industries,* 46 Wn. (2d) 31, 278 P. (2d) 390 (1955), wherein we said:

"In order to establish that the supervisor's order was incorrect on the date it was issued, a claimant must prove by expert medical testimony, some of it based upon *objective symptoms which existed on or prior to the closing date,* that his rate of disability on the date of the closing order was greater than the supervisor found it to be. *Moses v. Department of Labor & Industries, supra,* [44 Wn. (2d) 511, 268 P. (2d) 665] and cases cited therein. To prove the *existence* of such objective symptoms, a claimant is required to produce medical evidence that the objective symptoms either (1) had been discovered by a medical expert who mentally noted or physically recorded such symptoms *on or prior to the closing date* or within a reasonable time thereafter, or (2) that the objective symptoms (such as a broken bone or an arthritic condition) had

left their own record in or on the claimant's body *on or prior to the closing date. . . ."*

The line of cases in which we have followed this rule relates to claims for aggravation, which require proof by competent medical testimony that the condition of the claimant changed from the time of the closing of the claim to the date of the application for reopening.

In the case at bar, there is no real issue as to a change of condition between the closing date of appellant's claim and the date of Dr. Steele's examination of her in 1952. The issue is rather one of causal relationship between the shocks and the appellant's subsequent condition. The rule of the *Hyde* case, *supra,* is therefore not applicable.

On rehearing, the respondents argued that the appellant's anxiety tension state pre-existed the employment exposure, and assuming the appellant's medical testimony is sufficient to establish an aggravation of the anxiety tension state, such aggravation would not be compensable. This argument is premised on the assumption that the shocks may have aggravated a pre-existing "non-industrial disease" and not a pre-existing occupational disease. (The latter was held compensable in *Kallos v. Department of Labor & Industries,* 46 Wn. (2d) 26, 278 P. (2d) 393 (1955).) Suffice it to say, the appellant's prior condition is an issue for the jury and it cannot be held, as a matter of law, that she was suffering from a pre-existing "non-industrial disease" prior to the shocks. Again, giving the testimony of Dr. Steele the inferences most favorable to the appellant, the jury would be entitled to find that the present condition of the appellant was the natural and proximate result of her employment unrelated to any pre-existing *disease.*

The appellant has also assigned as error certain alleged improper proceedings before the board of industrial insurance appeals, which she contends deprived her of a fair hearing. These matters were not called to the attention of the trial court and should not, therefore, be considered for the first time on appeal. *Braman v. Kuper,* 51 Wn. (2d)

676, 321 P. (2d) 275 (1958); Lewis. Pac. Dairymen's Ass'n v. Turner, 50 Wn. (2d) 762, 314 P. (2d) 625 (1957); Unemployment Compensation Department v. Hunt, 17 Wn. (2d) 228, 135 P. (2d) 89 (1943).

The appellant established a *prima facie* case. The factual issues are for the jury to determine. The judgment should be reversed and a new trial ordered on the record, in accordance with the views expressed herein.

FINLEY, J. concurs with HUNTER, J.

FOSTER, J. (dissenting)—While I agree with Judge Hunter's views, I dissent upon the additional ground that the statute, as construed by the court, renders the industrial insurance act unconstitutional under the due process clause of the 14th amendment to the United States constitution.

The court holds:

"The supervisor held that such a series of shocks did not constitute an industrial injury. We agree. . . ." *Cooper v. Department of Labor & Industries*, 49 Wn. (2d) 826, 307 P. (2d) 272.

This in itself would not render the industrial insurance act unconstitutional if appellant could recover in a civil action for the injury sustained, but the legislature has abolished all civil actions for damages arising out of the relationship of master and servant. The court's decision leaves nothing in place of the abolished right. The statute is:

" . . . The state of Washington, therefore, exercising herein its police and sovereign power, declares that all phases of the premises are withdrawn from private controversy and sure and certain relief for workmen, injured in extrahazardous work, and their families and dependents, is hereby provided, regardless of questions of fault and to the exclusion of every other remedy, proceeding or compensation, except as otherwise provided in this title, and to that end all civil actions and civil causes of action for such personal injuries and all jurisdiction of the courts of the state over such causes are hereby abolished, except as in this title provided." RCW 51.04.010.

The constitutionality of our industrial insurance act was sustained in *Mountain Tbr. Co. v. Washington*, 243 U. S. 219, 61 L. Ed. 685, 37 S. Ct. 260, upon the hypothesis that the right to compensation was the *quid pro quo* for the civil damage action.[2] In *New York Central R. Co. v. White*, 243 U. S. 188, 61 L. Ed. 667, 37 S. Ct. 247, decided the same day (March 6, 1917), the United States supreme court warned that a state could not constitutionally abolish the civil action for damage without providing something in its stead. The court said:

" . . . Nor is it necessary, for the purposes of the present case, to say that a State might, without violence to the constitutional guaranty of 'due process of law,' suddenly set aside all common-law rules respecting liability as between employer and employee, without providing a reasonably just substitute. Considering the vast industrial organization of the State of New York, for instance, with hundreds of thousands of plants and millions of wage-earners, each employer on the one hand having embarked his capital, and each employee on the other having taken up his particular mode of earning a livelihood, in reliance upon the probable permanence of an established body of law governing the relation, it perhaps may be doubted whether the State could abolish all rights of action on the one hand, or all defenses on the other, without setting up something adequate in their stead. . . . "

In *Anthony v. National Fruit Canning Co.*, 185 Wash. 637, 56 P. (2d) 688, we held that an able-bodied widower could not recover for the death of his wife who was killed in extrahazardous industry, notwithstanding that the industrial insurance act denied compensation in such instances unless the surviving husband was an invalid. Subsequently, in *Epley v. Department of Labor & Industries*, 191 Wash. 162, 70 P. (2d) 1032, the court commented:

---

[2]"From this recital it will be clear that the fundamental purpose of the act is to abolish private rights of action for damages to employees in the hazardous industries (and in any other industry at the option of employer and employees), and to substitute a system of compensation to injured workmen and their dependents out of a public fund established and maintained by contributions required to be made by the employers in proportion to the hazard of each class of occupation."

"In the case at bar, claimants are asking for the very relief to which the Anthonys were relegated in that action. If we now hold that claimants can have no relief under the workmen's compensation act, we must say that the children of a woman worker, killed in an extrahazardous employment, have no remedy at all unless they also happen to be so unfortunate as to have an invalid father. . . ."

Because of the statutory abolition of all civil causes of action for personal injuries in extrahazardous employment, the court's decision today renders the industrial insurance act unconstitutional.

Such, then, is the additional reason for my dissent.