**In re INITIATIVE PETITION NO. 348, STATE QUESTION NO. 640.**

**No. 76277.**

Supreme Court of Oklahoma.

Oct. 29, 1991.

Rehearing Denied Dec. 3, 1991.

As Corrected Feb. 20, 1992.

Stanley M. Ward and Duchess Bartmess, Norman, for proponents S.T.O.P. New Taxes.

Lee Slater, Carol Dennis and Thomas E. Prince, York & Slater, Oklahoma City, for protestant Rosie Brown.

Thomas Dee Frasier and Steven R. Hickman, Tulsa, for protestant James C. Thomas.

LAVENDER, Justice.

This is an original action brought pursuant to 34 O.S.1981 § 8 challenging the legality of Initiative Petition 348, State Question 640 (Petition). The Petition purports to amend by the initiative process[1] Article V, § 33 of the Oklahoma Constitution. The amendment would impose severe limitations upon the Legislature's ability to raise new revenue.

We begin by emphasizing that our inquiry is limited to those challenges fundamental to the validity of the Petition as a whole. We will not attempt to resolve uncertainties ensuing from the interpretation or application of the Petition. Such issues are better reserved for a day when they can be directly challenged. Likewise, we will not deliberate the wisdom of the proposed amendment, as that question will be answered by the voters of Oklahoma, rather than this court.[2] With those qualifications in mind, we conclude, the Petition survives alleged infirmities and is therefore legally sufficient for submission to the people of Oklahoma.

## FACTS

Oklahoma's Constitution, Article V, § 33 reads:

All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills. No revenue bill shall be passed during the five last days of the session.

The Petition, if adopted, would require all revenue raising bills[3] be approved by a majority of the people at the next general election unless such revenue bill was approved by a three-fourths vote of both houses. If approved by three-fourths of both houses, the bill would not be subject to an emergency measure provision and would not go into effect until ninety (90) days after the bill's approval by the Legislature and appropriate action by the Governor. Such a bill could still be defeated or its effective date delayed by a referendum of the people during the ninety day period.[4]

Multiple protests have been alleged on behalf of two Protestants, Thomas and

1. "Initiative is the power reserved to the people by the constitution to propose bills and laws and to enact or reject them at the polls independent of legislative assembly." *Wyatt v. Clark,* 299 P.2d 799, 801–01 (Okla.1956).

2. *In re Initiative Petition No. 314,* 625 P.2d 595, 608 (Okla.1981) we opined:

Courts do not concern themselves with the expediency or wisdom of laws, but only with their legality. The social and economic policies affecting the general welfare of the people are committed exclusively to the legislative branch of government, and by our fundamental concept of government, the judiciary is not permitted to interfere therewith except in so far as the legislation may transgress fundamental legal restrictions. The chief executive may recommend, and the Legislature may enact, or the people exercising their reserved power, may initiate and approve at the polls, any legislation they may deem advisable.

3. 'Revenue Bills' are those that levy taxes in the strict sense of the word and are not bills for other purposes which may incidentally create revenue. *Pure Oil Co. v. Oklahoma Tax Commission,* 179 Okla. 479, 482, 66 P.2d 1097, 1100 (1936).

4. The amendment if adopted would revise section 33 to read as follows:

A. All bills for raising revenue shall originate in the House of Representatives. The Senate may propose amendments to revenue bills.

B. No revenue bill shall be passed during the five last days of the session.

C. Any revenue bill originating in the House of Representatives shall not become effective until it has been referred to the people of the state at the next general election held throughout the state and shall become effective and be in force when it has been approved by a majority of the votes cast on the measure at such election and not otherwise except as otherwise provided in subsection D of this section.

D. Any revenue bill originating in the House of Representatives may become law without being submitted to a vote of the people of the state if such bill receives the approval of three-fourths (¾) of the membership of the House of Representatives and three-fourths (¾) of the membership of the Senate and is submitted to the Governor for appropriate action. Any such revenue bill shall not be subject to the emergency measure provisions authorized in Section 58 of this Article and shall not become effective and be in force until ninety days after it has been approved by the Legislature and acted on by the Governor.

Brown, however, given the similarity of the arguments, we address them concurrently. Specifically, Protestants assert the Petition violates Article XXIV, § 1 of the Oklahoma constitution in that it embraces more than one general subject; that the Petition is misleading and deceptive and violative of 34 O.S.1981, §§ 3 & 9; that it directly conflicts with other articles of the constitution and threatens the constitutional plan for financing state government. Protestants further argue the Petition contravenes the constitutional guarantee of a republican form of government. Finally, Protestants maintain the Petition is invalid because the power of the initiative is not without limits and this amendment exceeds the power reserved to the people. We address Protestants' arguments in order to establish the legal sufficiency of this petition; our inquiry begins with a general analysis of the right of the initiative.

## ANALYSIS

■ The people's right to institute change through the initiative process is a fundamental characteristic of Oklahoma government. Oklahoma's constitution Article V, § 1 provides:

> The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; **but the people reserve to themselves the power to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature.**

(emphasis added).

The right of the initiative is not absolute in that there are both constitutional and statutory limitations,[5] however, this power, **reserved by the people**, grants them the constitutional right to amend even these limitations. Whether right or wrong, this **reserved power**, authorizes the people of the state of Oklahoma to amend[6] the constitution they created.

> In other words, ... it is universally conceded that the **people are sovereign and that they have power to adopt a constitution and to change their own work at will....**[7]

Understandably, given this constitutional foundation, we have repeatedly maintained our defense of the initiative process. In *Oliver v. Tulsa,*[8] **we quoted** with approval the following persuasive language from another state court:

> The right of initiative is precious to the people and is one which the courts are zealous to preserve to the fullest tenable measure of spirit as well as letter.... **All doubt as to the construction of pertinent provisions is to be resolved in favor of the initiative and such legislation is to be given the same liberal construction as that afforded election statutes generally.**

In *In re Referendum Petition No. 18,*[9] we articulated, "[t]he right to petition for a vote of the people by Initiative and Referendum provided by Art. 5, § 2, of the Constitution of Oklahoma is a **sacred right** to be carefully preserved."

In *Ruth v. Peshek,*[10] we declared:

> The people reserved to themselves the power to propose laws and amendments to the Constitution.... This power so reserved to the people should not be crippled, avoided, or denied by technical construction by the courts. **It is the duty of the courts to construe and preserve this right as intended by the people in**

---

**5.** *In re Initiative Petition No. 344,* 797 P.2d 326, 330 (1990).

**6.** Black's Law Dictionary (abr. 5th ed. 1983) defines the word amend as, "[t]o change for the better by removing defects or faults. To change, correct, revise, improve."

**7.** *In re Initiative Petition No. 314,* 625 P.2d at 608.

**8.** 654 P.2d 607, 613 (Okla.1982) (emphasis added).

**9.** 417 P.2d 295, 297 (Okla.1966) (emphasis added).

**10.** 153 Okla. 147, 150, 5 P.2d 108, 111 (1931) (emphasis added).

**adopting the Constitution, and thereby reserve unto the people this power.**

Ours is a government which rests upon the will of the governed. The initiative and referendum is the machinery whereby self-governing people may express their opinion in concrete form upon matters of public concern. **If the people are to be self-governed, it is essential that they shall have a right to vote upon questions of public interest and register the public will.**

Under these constitutional mandates and precedential principles of law, we consider the proposed Petition.

## A. ONE SUBJECT RULE/MISLEADING EFFECT

Article XXIV, § 1 of the Oklahoma Constitution provides:

No proposal for the amendment or alteration of the Constitution which is submitted to the voters shall embrace more than one general subject and the voters shall vote separately for or against each proposal submitted; provided, however, that in the submission of proposals for the amendment of the Constitution by articles, which embrace one general subject, each proposed article shall be deemed a single proposal or proposition.

In *In re Initiative Petition No. 314*[11] we held this section was applicable to initiative petitions.

■ Protestant Thomas concedes the petition on its face does not encompass more than one subject, that subject being taxation. Rather, Protestant charges the petition violates the one subject rule because it would **affect** more than one subject. Further, Protestant contends the Petition is misleading in that the voter is not given notice of the **affected** articles. Protestant Brown makes in essence the same argument.

While appreciating Protestant Thomas's approach in conceding what is apparent on its face, we nevertheless disagree with both Protestants' contention that an amendment, having an **affect** on other articles of the constitution, violates the one subject rule or is misleading. Moreover, assuming for the sake of argument such articles would be so affected, those issues are not yet ripe for review and therefore have no bearing on the sufficiency of this Petition.

In *In re Initiative Petition No. 342*,[12] we held:

The purpose of the one general subject criteria is to prevent deceit or the presentation of a misleading proposal and to prevent logrolling, the combining of unrelated proposals. In *In re Initiative Petition No. 314*, this court adopted the following test: If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition.

Protestants cite us two cases in which this court has recently struck down the proposed initiatives based on this single subject test, purporting that those cases are factually controlling. However, these cases offer no support for Protestants' contention. Each of those proposed initiatives clearly contained more than one subject as evidenced by the following quoted language from *In re Initiative Petition No. 344*.[13] There we found the Petition contained:

---

**11.** 625 P.2d at 600.

**12.** 797 P.2d 331, 332 (Okla.1990) (citations omitted).

**13.** 797 P.2d at 329.

numerous subjects from the method of the election of the LT. Governor, to changing the term of board and commission members including non-attorney members of the Judicial Nominating Commission, to giving the Governor the sole authority 'to grant reprieves, commutations, and pardons', to changing the Executive Branch to a cabinet form of government, to repealing the constitutional authority for certain boards. Some of the sections in the amendment are, at best, tenuously related to other sections. The sections are not so intertwined as to require that they be adopted at the same time in order to preserve the integrity of each section.... A voter supporting any one of these provisions could not reasonably be expected to support the principle of the others.

Further, in *In re Initiative Petition No. 342*.[14] we determined there were:

numerous subjects covered by the Petition ranging from financial institutions holding stock in another financial institution to the power of eminent domain of foreign corporations to the fellow-servant doctrine rule. **The only connection that these topics have to each other is that they all tangentially relate to the general subject of corporations. Otherwise, they are unrelated.**

These cases are unlike the present proposed amendment. The only subject matter addressed in the petition is a procedural requirement allowing for direct participation by the people in the enactment of revenue measures. While the amendment, if adopted, may indeed **affect** other articles of the constitution, such as the emergency clause, the balanced budget act, the Governor's veto, etc., that is insufficient reason for this court today to deny the people of Oklahoma the right to vote on this Petition, though indeed, the Petition's **effect** may result in subsequent challenges.

Again, the dispositive test is that the proposed amendment **itself** not contain more than one subject, so as to enable the voter to make a choice and not be misled, or forced to choose between two different proposals presented in one amendment. While that choice may **result** in repealing other constitutional guarantees, that is a consequence of the voting process, rather than any fault of the proposed amendment. Moreover, were we to adopt Protestants' test, the occasion may never arise in which an initiative could satisfy one that is so narrowly restrictive since, by their very nature, articles of the constitution interrelate. In *Cowart v. Piper Aircraft Corp.*,[15] we held the constitution must be read in its entirety, and all articles construed together.

Our analysis persuades us the proposed amendment does not violate the single subject requirement. The Petition contains only one subject, a procedural requirement for raising revenue, albeit, an inordinately restrictive one. Likewise, we do not find the Petition misleading for failing to state what **effect it will have on the entire constitutional scheme if the Petition is adopted.**[16] Finally, Protestants' argument lacks authoritative support and does not substantiate invalidating the Petition.

## B. DESTROYS STATE FINANCING/EXCEEDS RESERVED POWER

■ Protestants assert, however, the amendment not only impacts or conflicts with numerous articles of the constitution, but destroys the entire design for financing state government as organized in the Oklahoma Constitution. For example, Protestants assert this amendment would destroy the Legislature's ability to balance the budget as provided for by the constitutional amendment of 1941. Furthermore, Protestants allege the Petition exceeds the power reserved under the initiative process as set forth in the Constitution.

---

**14.** 797 P.2d at 333 (emphasis added).

**15.** 665 P.2d 315 (Okla.1983).

**16.** The ballot title presented by the Attorney General and herein approved by this court, does include information to the effect that this amendment **changes the method** by which state government raises revenue.

Our analysis of the initiative process rebuts these challenges in that the people have the **sovereign right** under the reserved power to institute constitutional tax reform by way of the initiative process. Protestants contend, however, that Article 5, §§ 7 & 36 limits the people's right of initiative. Section 7 provides:

> The reservation of the powers of the initiative and referendum in this article shall not deprive the Legislature of the right to repeal any law, propose or pass any measure, which may be consistent with the Constitution of the State and the Constitution of the United States.

Section 36 reads:

> The authority of the Legislature shall extend to all rightful subjects of legislation, and any specific grant of authority in this Constitution, upon any subject whatsoever, shall not work a restriction, limitation, or exclusion of such authority upon the same or any other subject or subjects whatsoever.

Protestants' argument is without merit as these **specific legislative grants** of power will always be subject to the **reserved power** of the people under Article V, § 1.

While this Petition, if adopted, may prevail over other sections of the constitution on the same subject matter,[17] this in and of itself is not fatal. In *In re Initiative Petition No. 281,*[18] we held, "that the real purpose of an initiative petition is to secure a vote of the people upon a proposed law or constitutional amendment. The repeal of any conflicting provisions of law in effect at the time the proposed law is to become effective is merely incidental to the purpose of such a petition."

Finally, it is mere conjecture as to whether this Petition will destroy the state financing scheme. While it is true, the Constitution grants the Legislature the right to raise additional revenues so as to balance the budget, if such revenues are not available, the Legislature could curtail or shut down government services in order to maintain the constitutionally required balanced budget. Moreover, though these things may occur, we cannot invalidate this Petition on such speculation. Thus, this challenge is insupportable and again, Protestants have failed to provide legal justification for declaring the Petition invalid.

## C. SUFFICIENCY OF GIST AND BALLOT TITLE

■ Protestants assert the Petition is invalid because it violates 34 O.S.Supp.1990, §§ 3 & 9 in that neither the gist nor the ballot title explain the effect of the amendment. However, we are not persuaded by Protestants' argument.

Section 3 states, "a simple statement of the gist of the proposition shall be printed on the top margin of each signature sheet...." The gist on this Petition reads:

> This measure will amend the Constitution to require any revenue raising bill passed by the legislature and sent to the Governor for action shall not become effective until it has been approved by a majority vote of the public, it allows a revenue raising measure to become effective without a vote by the public if it is approved by ¾ vote of each house of the legislature and acted on by the Governor but allows time for referendum by prohibiting enacting of emergency clause.

The pertinent part of Section 9 states, "The ballot title shall explain in basic words, which can be easily found in dictionaries of general usage, the effect of the proposition...." The ballot title prepared by the Attorney General reads as follows:

> This measure amends the State Constitution. It adds new provisions to Section 33 of Article 5. These would change the method by which state government makes laws that raise revenue. The measure requires that a bill to raise revenue be voted upon by the people at the next general election. A bill would not be effective until it was approved by a

---

**17.** *Sharpe v. State ex rel. Oklahoma Bar Association,* 448 P.2d 301, 306 (Okla.1968), *cert. denied,* 394 U.S. 904 (1969).

**18.** 434 P.2d 941, 946 (Okla.1967).

majority of the voters. The measure also provides a way that a revenue bill could become law without a vote of the people. A bill would have to be approved by a ¾ vote of each house of the legislature and go to the Governor for proper action. A revenue bill approved by a ¾ vote of each house of the legislature would not become effective until ninety days after the approval date. Such a bill would not be subject to the emergency measure provision.

Shall the proposed Constitutional amendment be approved?

( ) Yes, for the Constitutional Amendment?

( ) No, against the Constitutional Amendment?

Protestants' cite us to In re Initiative Petition No. 344,[19] as providing the standard for testing whether the gist and ballot title are legally correct. In that case, we pronounced, that they "must be brief, descriptive of the effect of the proposition, not deceiving but informative and revealing

of the design and purpose of the petition." This case is factually distinguishable, however, in that the petition contained more than one subject and was therefore facially void.

The proposed Petition though does not contain more than one subject and satisfies the enumerated test. The gist and ballot title sufficiently appraises the voters what the measure is intended to do, i.e., "change the method by which state government makes laws that raise revenue." We therefore approve the ballot title presented by the Attorney General of this state[20] and find it sufficient for submission to the people.

### D. GUARANTEE CLAUSE

■ Protestants argue the proposed amendment violates the United States Constitution, Article IV, § 4 holding "[t]he United States shall guarantee to every State in this Union a Republican form of Government...."[21] They assert the pro-

---

**19.** 797 P.2d at 330.

**20.** See Covey v. Williamson, 265 P.2d 457 (Okla. 1953).

**21.** The Guaranty Clause has generated considerable discussion over the years. Prior to 1962, the United States Supreme Court held that the clause was judicially unenforceable because it presented a political question. Then in Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962), the Supreme Court issued factors for determining when a question is political. Prominent among those factors was whether there was a "textually demonstrable constitutional commitment of the issue to a coordinate political department...." Though the Court did not find the Guaranty Clause justiciable in that case, in Reynolds v. Sims, 377 U.S. 533, 582, 84 S.Ct. 1362, 1392, 12 L.Ed.2d 506 (1964) the Court indicated this was not necessarily **always** true when it opined, "As we stated in Baker v. Carr, **some** questions raised under the Guaranty Clause are nonjusticiable, where "political in nature and where there is a clear absence of judicially manageable standards." (emphasis added). But see City of Rome v. United States, 446 U.S. 156, 182 n. 17, 100 S.Ct. 1548, 1564 n. 17, 64 L.Ed.2d 119 (1980) where the Court citing Baker noted the guaranty clause was nonjusticiable. In Gregory et al., Judges v. Ashcroft, Governor of Missouri, — U.S. ——, 111 S.Ct. 2395, 2402, 115 L.Ed.2d 410 (1991), the Court considered whether a state constitutional provision requiring mandatory

retirement age for most state judges violated the federal Age Discrimination in Employment Act of 1967. After citing a number of cases in which the Court had relaxed its scrutiny given the issues rested firmly on a State's constitutional prerogative, the Court concluded:

> These cases stand in recognition of the authority of the people of the States to determine the qualifications of their most important government officials. **It is an authority that lies at 'the heart of representative government.' It is a power reserved to the States under the Tenth Amendment and guaranteed them by that provision of the Constitution under which the United States 'guarantee[s] to every State in this Union a Republican Form of Government.'** (citations omitted).

For a sister state court's analysis concluding the Guaranty Clause is justiciable see Vansickle v. Shanahan, 212 Kan. 426, 437–38, 511 P.2d 223, 234 (1973).

> [T]he contention all cases arising under the guaranty clause are nonjusticiable has no historical precedent. Instead, as in other cases wherein the "political" controversy bar to judicial enforcement has been raised, we must look to the facts and circumstances surrounding the litigation, as well as the theory upon which the constitutional challenge is premised, to ascertain whether the issue may be resolved by the judicial process.

For further discussion on the guaranty clause see Merritt, The Guarantee Clause and State

posed amendment violates our republican form of government (lawmaking by elected representatives) because it destroys the Legislature's decision making power in the area of taxation.

In keeping with our directive in *In re Supreme Court Adjudication of Initiative Petitions*,[22] we will review the constitutionality of questions presented by the people of this state not only as to procedure and form, but also subject matter. Accordingly, we consider whether the Petition violates Article IV, § 4 of the federal constitution.

In *Kadderly v. City of Portland*,[23] the Oregon Supreme Court explained that the purpose of Article IV, § 4 of the U.S. constitution was:

> to protect the people of the several states against aristocratic and monarchial invasions, and against insurrections and domestic violence, and to prevent them from abolishing a republic form of government. **But it does not forbid them from amending or changing their Constitution in any way they may see fit, so long as none of these results is accomplished.**

Our own Bill of Rights, Article 2, § 1 of the Oklahoma constitution reads:

> All political power is inherent in the people; and government is instituted for their protection, security, and benefit and to promote their general welfare; **and they have the right to alter or reform the same whenever the public good may require it: Provided, such change be not repugnant to the Constitution of the United States.**

(emphasis added).

Article 24, § 3 states that though the Legislature may also present proposals for amendments, this shall not impair the people's right to amend the Constitution by initiative petition.

As evidenced by these various constitutional articles, and more specifically, Article V, § 1, which reserves the power for the initiative process, we conclude the people have the right under this **reserved power** to amend the constitution, provided, it remains a republican form of government as guaranteed by the United States Constitution. Thus the dispositive question presented is whether the Petition would so alter the existing system of government that it would constitute a loss of representative government. We have determined that while the Petition undoubtedly restricts, it does not abolish government by representation and thus does not breach the federal guaranty of Article IV, § 4.

What the court in *Kadderly* had to say concerning the Oregon petition is instructive in the case at bar:

> The initiative and referendum amendment does not abolish or destroy the republican form of government, or substitute another in its place. The representative character of the government still remains. The people have simply reserved to themselves a larger share of legislative power, but they have not overthrown the republican form of the government, or substituted another in its place. The government is still divided into the legislative, executive, and judicial departments, the duties of which are discharged by representatives selected by the people. Under this amendment, it is true, the people may exercise a legislative power, and may, in effect, veto or defeat bills passed and approved by the Legislature and the Governor; but the legislative and executive departments are not destroyed, nor are their powers or authority materially curtailed.[24]

We acknowledge Petitioner's contention that the continued existence of any government is dependent on the right to tax. "[T]he power of taxation for revenue purposes is probably the most vital and essen-

*Autonomy: Federalism for A Third Century,* 88 Colum.Rev., 1, 50–55 (1988); Linde, *When Is Initiative Lawmaking Not "Republican Government"?,* 17 Hastings Constitutional Law Quarterly, 159, 172 (1989).

**22.** 534 P.2d 3 (Okla.1975).

**23.** 44 Or. 118, 144, 74 P. 710, 719 (1903) (emphasis added).

**24.** *Id.,* 44 Or. at 145–46, 74 P. at 720.

tial attribute of the government. Without such power it cannot function." [25] Under our system of government, the Legislature has been charged with this responsibility. It is this power by which the Legislature balances the budget and manages the finances of state government. It is this power by which the stability of state government is maintained.

Undeniably, however, a basic right of the people is the liberty to direct how much or how little government may spend. Indeed, this Petition represents the quintessential subject for the initiative process in that the issue of taxation has from the very beginning of this country been a topic of paramount concern.[26]

After an extensive analysis, we conclude, the Petition, if adopted, would not result in the destruction of our representative form of government. Certainly, the Petition will impact significantly the governmental framework of this state and perhaps, not without difficulty and frustration given limited resources. However, the question presented is not whether this is a "good" or "bad" amendment, rather, if it is legal; we answer affirmatively.

## CONCLUSION

Given the reasoning herein expressed, we find Initiative Petition No. 348 is declared LEGALLY SUFFICIENT. The Ballot Title presented by the Attorney General is thereby APPROVED.

HODGES, V.C.J., and HARGRAVE, ALMA WILSON and SUMMERS, JJ., concur.

OPALA, C.J., and SIMMS and KAUGER, JJ., concur in result.

DOOLIN, J., dissents.

OPALA, Chief Justice, concurring in result.

The court declares today that the petition under consideration—which would impose limitations upon the legislature's power to raise new taxes—qualifies for submission to a vote of the electorate. I concur in the court's judgment *only insofar as* the court declares that the measure is not vulnerable to protestants' presubmission procedural challenges. But I recede from the court's review of the measure for conformity to the "Republican Form of Government" guaranteed by Art. 4, § 4, U.S. Const.[1] Remaining bound by my continued and unswerving commitment to the teachings of *Threadgill*,[2] I would not undertake to review the measure's provisions for conformity to constitutional norms. *Threadgill* teaches that conformity of a measure's content to constitutional norms may not be judicially examined *in advance of the initiative petition's adoption.* Permissible preadoption constitutional challenges are only those which address fatally vitiating infirmities in the initiative process itself.[3] The electorate's effort at legislating directly should not be scrutinized by attacks other than those which affect the petition's compliance with some *sine qua non* sub-

25. *Watchtower Bible & Tract Soc. v. Los Angeles County,* 30 Cal.2d 426, 429, 182 P.2d 178, 180 (1947) cert. denied, 332 U.S. 811, 68 S.Ct. 112, 92 L.Ed. 389 (1947).

26. Taxation without representation was a major source of contention and ultimately contributed to our break from England.

1. The terms of Art. 4, § 4, U.S. Const., provide in pertinent part:
   "The United States shall guarantee to every State in this Union a *Republican Form of Government,* and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." (Emphasis added.)

2. *Threadgill v. Cross,* 26 Okl. 403, 109 P. 558 (1910).

3. My commitment to *Threadgill, supra* note 2, is reported in several prior decisions. *See In re Initiative Petition No. 347 State Question No. 639,* Okl., 813 P.2d 1019, 1037 (1991) (Opala, C.J., concurring); *In re Initiative Petition No. 349* (No. 76,437, February 20, 1991) (Opala, C.J., concurring in part and dissenting in part); *In re Initiative Petition No. 341,* Okl., 796 P.2d 267, 275 (1990) (Opala, V.C.J., concurring in result); *In re Initiative Petition No. 317, Etc.,* Okl., 648 P.2d 1207, 1222 (1982) (Opala, J., concurring in the judgment); *In re Initiative Petition No. 315, Etc.,* Okl., 649 P.2d 545, 554–555 (1982) (Opala, J., concurring in result).

mission requirement. Furthermore, the court's review of protestants' guarantee-clause claims is without any support in federal jurisprudence. Even if guarantee-clause issues were justiciable, there are no authoritative federal-law standards by which we can gauge conformity to the fundamental-law mandate for a "republican form" of government.

## I

## A

### TODAY'S PRESUBMISSION REVIEW OFFENDS THE "PRUDENTIAL" RULE OF NECESSITY

I consider today's presubmission review of the measure's conformity to the constitution—i.e., whether the measure imposes limitations upon the legislature's taxing power that would either destroy the state financing scheme or violate the federal-law guarantee of a republican form of government—to offend the time-honored prudential rule. This is so because constitutional

challenges to legislation before it becomes law are to be disallowed.[4] No necessity exists for presubmission resolution of the constitutional validity of these content-based challenges to the petition; they do not impair the initiative petition's legal fitness for submission to a vote by the people.

In presubmission stages (a) we cannot be sure that when the petition is submitted for a vote the electorate will adopt the measure as law and (b) there is *not* then a lively controversy in which antagonistic adversaries press for testing a legal norm's validity against the backdrop of facts unfolded when the measure came to be applied as law.[5] Where there is no forensic scenario in the context of which challenged law is to be enforced, courts will not assess the attacked norm's constitutional soundness *in vacuo*.[6] Any departure from these basic teachings of *Threadgill* creates an impermissible burden on the people's fundamental-law power to initiate and pass measures that may change the state's constitution as well as her statutes.[7]

---

**4.** The prudential rule of necessity, adhered to today by *all* state and federal courts, holds that constitutional issues must not be resolved in advance of strict necessity. *In re Initiative Petition No. 347 State Question No. 639, supra* note 3 at 1027; *Smith v. Westinghouse Elec. Corp.,* Okl., 732 P.2d 466, 467 n. 3 (1987); *I.N.S. v. Chadha,* 462 U.S. 919, 937, 103 S.Ct. 2764, 2776, 77 L.Ed.2d 317 (1983); *Ashwander v. Tennessee Valley Authority,* 297 U.S. 288, 347, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); *see also Schwartz v. Diehl,* Okl., 568 P.2d 280, 283 (1977); *Dablemont v. State, Department of Public Safety,* Okl., 543 P.2d 563, 564–565 (1975).

**5.** One reason given by Justice Grodin (formerly of the California Supreme Court) in his book, *In Pursuit of Justice* (Univ. of Cal.Press 1989) at 106, for moving "cautiously in considering a preelection challenge to an initiative is that the decisional process is likely to be enhanced if evaluation of the challenge is deferred until after the election. Considerations relevant to the constitutional issue may develop in the course of the campaign itself.... Moreover, the timing of a preelection challenge seldom leaves room for the studied consideration appropriate to decision of an important legal issue." Other legal commentators have observed: "Most courts will not entertain a challenge to a measure's substantive validity before the election. A minority of courts, however, are willing to conduct such review. Arguably, pre-election

review of a measure's substantive validity involves issuing an advisory opinion, violates ripeness requirements and the policy of avoiding unnecessary constitutional questions, and is an unwarranted judicial intrusion into a legislative process." Gordon and Magleby, Pre–Election Judicial Review of Initiatives and Referendums, 64 Notre Dame L.R.298, 302 (1989); *see in this connection* Grossman, The Initiative and Referendum Process: The Michigan Experience, 28 Wayne L.Rev. 77, 111 (1981); Note, The Judiciary and Popular Democracy: Should Courts Review Ballot Measures Prior to Elections?, 53 Fordham L.Rev. 919, 921–22 (1985).

**6.** *Smith v. Westinghouse Elec. Corp., supra* note 4.

**7.** The constitutional provisions governing the initiative and referendum are Art 5, §§ 1–8, Okl. Const. Section 1 provides:
"The Legislative authority of the State shall be vested in a Legislature, consisting of a Senate and a House of Representatives; but *the people reserve to themselves the power to propose laws and amendments* to the Constitution and to enact or reject the same at the polls independent of the Legislature, and also reserve power at their own option to approve or reject at the polls any act of the Legislature." (Emphasis added.)
In *Oklahoma Tax Commission v. Smith,* Okl., 610 P.2d 794, 807 (1980), we stated that Art. 5, §§ 1, 2 and 7, together "comprise an initiative

## B

## NO ONE HAS STANDING TO CHALLENGE THE CONSTITUTIONALITY OF AN INITIATIVE PETITION'S SUBSTANTIVE PROVISIONS UNTIL THEY ARE APPLIED AS EFFECTIVE LAW

Standing, the legal right of a person to challenge the conduct of another in a judicial forum,[8] may be raised at any level of the judicial process or by the court on its own motion.[9] Standing must be predicated on interest that is "direct, immediate and substantial."[10] The concept of standing focuses on whether the party invoking the court's jurisdiction has a legally cognizable interest in the outcome of the controversy.[11] A party seeking relief must show actual or threatened injury of some kind.[12] The inquiry is whether the party has in fact suffered injury to a legally protected interest within the contemplation of statutory or constitutional provisions.[13]

In pre-adoption stages *no one has standing* to assert a content-based challenge to an initiative or referendum petition, which is unrelated to any *sine qua non* requirement for submission.[14] No one can be ad-

versely affected by a measure until it has been applied or enforced as effective law. No showing of actual or threatened injury can be made before the measure becomes effective law. Only a person against whom effective law *has been applied* would have standing to challenge its constitutionality. A petition may be declared ineligible for a vote of the electorate only when it is fraught *with a fatal impediment to its submission.*[15] A defect in the form of the petition that would operate to render it unfit for submission is the kind of fatal flaw a citizen may assert *and have standing to press. This is so because, in such instances,* we know in advance of submission that, if adopted, the petition would have no legal effect as law.

In short, once an initiative petition passes muster under the threshold test for submission[16] to a vote of the people *no* constitutional attacks addressed to the *measure's* substantive provisions may be judicially entertained in preelection stages. All such attacks must await the measure's adoption and its application *in the context of a lively postadoption controversy be-*

system whereby both the people and the Legislature may propose legislation independently, and neither *can block the effort of the other during the process....*" Our teaching in *Smith* applies with equal force to bar judicial as well as legislative interference with initiative process. Courts should be loath to impose judicial restraint on the electorate's power to make law. As the Arizona Supreme Court aptly remarked in *State v. Osborn,* 16 Ariz. 247, 143 P. 117, 118 (1914), to place court-imposed restrictions "would be tantamount to claiming the power of life and death over every initiated measure by the people. It would limit the right of the people to propose only valid laws, whereas the other lawmaking body, the Legislature, would go untrammeled as to the legal soundness of its measures."

8. *State ex rel. Cartwright v. Okl. Tax Com'n,* Okl., 653 P.2d 1230, 1232 (1982); *Matter of Adoption of Baby Boy D,* Okl., 742 P.2d 1059, 1062 (1985).

9. *Matter of Estate of Doan,* Okl., 727 P.2d 574, 576 n. 3 (1986).

10. *Underside v. Lathrop,* Okl., 645 P.2d 514, 517 (1982); *Democratic Party of Oklahoma v. Estep,* Okl., 652 P.2d 271, 274 n. 13 (1982); *Matter of Estate of Doan, supra* note 21 at 576.

11. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962); *Flast v. Cohen,* 392 U.S. 83, 100, 88 S.Ct. 1942, 1953, 20 L.Ed.2d 947 (1968); *Application of State ex rel. Dept. of Transp.,* Okl., 646 P.2d 605, 609 (1982).

12. *O'Shea v. Littleton,* 414 U.S. 488, 493–494, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974).

13. *Matter of Adoption of Baby Boy D, supra* note 8 at 1062; *Independent School Dist. No. 9 v. Glass,* Okl., 639 P.2d 1233, 1237 (1982).

14. For an initiative to pass the threshold test it must (a) be in substantial compliance with the *sine qua non* procedural requirements for submission, (b) address but a single subject [*In re Initiative Petition No. 344,* Okl., 797 P.2d 326, 330 (1990); *In re Initiative Petition No. 342,* Okl., 797 P.2d 331, 333 (1990) ]; and (c) embrace content appropriate for lawmaking by the people [*In re Supreme Court Adjudication, Etc.,* Okl., 534 P.2d 3 (1975) ]; *see also in this connection In re Initiative Petition No. 347, supra* note 3 (Opala, C.J., concurring).

15. The measure need only pass a threshold test to qualify for submission, *see supra* note 14.

16. *See supra* note 14.

*tween antagonistic adversaries with legal standing to press challenges.*

## II

GUARANTEE–CLAUSE ISSUES HAVE NEVER BEEN HELD JUSTICIABLE BY THE U.S. SUPREME COURT—THE HIGHEST COURT WITH THE POWER TO PRONOUNCE FEDERAL CONSTITUTIONAL JURISPRUDENCE

The U.S. Constitution provides that "[t]he United States shall guarantee to every State in this Union a Republican Form of Government." [17] *The guarantee clause is the only constitutional clause which the U.S. Supreme Court has held to be judicially unenforceable.*[18]

The most significant case in the clause's development is *Luther v. Borden,*[19] where the Court first announced in 1849 the principle that federal courts will not enforce guarantee-clause claims. In this seminal case the Court refused to decide which of two factions in a Rhode Island political upheaval was the proper government. The Court found that the guarantee clause treats the issue of a state government's legitimacy as a *political question* entrusted to Congress. In turn, Congress affirms a state's republican form of government by admitting the state's senators and representatives "into the councils of the Union." [20]

Sixty years later in *Pacific States Tel. & Tel. Co. v. Oregon,*[21] the Court laid to rest all challenges to the constitutional validity of initiative and referendum under the guarantee clause. There, the Court re-

---

**17.** Art. 4, § 4, U.S. Const., *supra* note 1.

**18.** *See* in this connection Heaton, The Guarantee Clause: A Role For The Courts, 16 Cumberland L.Rev. 477, 478 (1986). The guarantee clause was first invoked in response to a series of rebellions against state or national authority between 1793 and 1843 when several brief episodes of violence flared up in the states, culminating in the 1842 Dorr Rebellion in Rhode Island. *See infra* note 19; Wiecek, The Guarantee Clause of the U.S. Constitution 78–85, (1972 Cornell University Press).

**19.** 48 U.S. (7 How.) 1, 12 L.Ed. 581 (1849). The issues pressed in *Luther* grew out of Dorr's rebellion of 1842. As the 1633 Charter of Rhode Island contained no provision for amendment and allowed only limited suffrage, dissatisfied citizens elected representatives to attend a constitutional convention, which, in turn, proposed a new state government. The new government was adopted by a majority vote of the adult male population, and its governor-elect Dorr tried unsuccessfully to uphold its authority by force. Thereafter, the issue was joined in a trespass action on the question whether officials of the charter government had acted pursuant to martial law to suppress an insurrection against the state government. The ultimate issue was which of the two competing governments was legitimate and lawful. Describing the question as political, the Court refused to decide the contest. *See* Wiecek, *supra* note 18 at 85–129.

**20.** *Luther v. Borden, supra* note 19, 48 U.S. (7 How.) at 41, 12 L.Ed. at 599.
*In several post-Luther opinions the Court has held guarantee-clause claims nonjusticiable po-*litical questions. *Baker v. Carr, supra* note 11; *Highland Farms Dairy, Inc. v. Agnew,* 300 U.S. 608, 57 S.Ct. 549, 81 L.Ed. 835 (1937); *Cochran v. Louisiana State Bd. of Educ.,* 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913 (1930); *Mountain Timber Co. v. Washington,* 243 U.S. 219, 37 S.Ct. 260, 61 L.Ed. 685 (1917); *Ohio ex rel. Davis v. Hildebrandt,* 241 U.S. 565, 36 S.Ct. 708, 60 L.Ed. 1172 (1916); *O'Neill v. Leamer,* 239 U.S. 244, 36 S.Ct. 54, 60 L.Ed. 249 (1915); *Pacific States Tel. & Tel. Co. v. Oregon,* 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377 (1912); *Kiernan v. Portland,* 223 U.S. 151, 32 S.Ct. 231, 56 L.Ed. 386 (1912). Even in the few early cases in which the Court considered guarantee-clause cases on the merits, there is not a single precedent in which an act or statute was invalidated. *See e.g. Michigan ex rel. Kies v. Lowrey,* 199 U.S. 233, 26 S.Ct. 27, 50 L.Ed. 167 (1905); *Forsyth v. Hammond,* 166 U.S. 506, 17 S.Ct. 665, 41 L.Ed. 1095 (1897); *In re Duncan,* 139 U.S. 449, 11 S.Ct. 573, 35 L.Ed. 219 (1891); *Minor v. Happersett,* 88 U.S. (21 Wall.) 162, 22 L.Ed. 627 (1875).

**21.** *Supra* note 20. *Pacific States* involved a challenge to the practice of enacting legislation by citizen initiative. In Oregon the people had used the initiative to enact a license tax on telephone company gross receipts within the state. *In Pacific States the Court never reached the merits of the claim,* concluding as it had in *Luther, supra* note 11, that guarantee-clause questions are "political in character" and thus "solely committed by the Constitution to the judgment of Congress." *Pacific States, supra* note 20, 223 U.S. at 133, 32 S.Ct. at 224. This matter, the Court said, was "absolutely foreclosed." 223 U.S. at 143, 32 S.Ct. at 228.

fused to find the initiative was unrepublican, holding that the political branches have the exclusive task of monitoring the guarantee clause and that the courts could not enforce it.

In *Colegrove v. Green*[22] the Court once again refused to take jurisdiction of a case involving an attack on the malapportionment of congressional districts. The Court rested its judgment[23] on the principle that "[v]iolation of the great guaranty of a republican form of government in States cannot be challenged in the courts."[24]

The Court reaffirmed in *Baker v. Carr*[25] its *Luther* and *Pacific States* jurisprudence that the republican-form guarantee is nonjusticiable. *Baker* involved a challenge to the apportionment of the Tennessee state legislature.[26] The decision premised nonjusticiability on the lack of "judicially manageable standards" by which to judge congressional or state action.[27] Legislative reapportionment, the Court held, must be measured by equal protection standards instead.

In *City of Rome v. United States*[28] the Court once again reaffirmed its commitment to the nonjusticiability notion. Relying on *Baker*, the Court refused to address the merits of a guarantee-clause claim because the "issue is not justiciable." Our own jurisprudence recognizes the guarantee clause's nonjusticiability.[29]

**22.** 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432 (1946).

**23.** Justice Frankfurter delivered the Court's judgment and not its opinion because only two other justices concurred in his opinion; one justice concurred in result, three others dissented, one was absent and another member of the Court had recently died. Wiecek, *supra* note 18 at 272.

**24.** *Colegrove v. Green, supra* note 22, 328 U.S. at 556, 66 S.Ct. at 1201, citing *Pacific States, supra* note 20.

**25.** *Supra* note 11.

**26.** *The Court cited Luther for the proposition that the guarantee provided no standards for a court to judge the validity of a state government.* Acknowledging that a "permanent" military government would "obviously" be unrepublican, the Court suggested that even at this extreme, responsibility for enforcement of the guarantee clause *would lie only with Congress and not with the courts. Baker v. Carr, supra* note 11, 369 U.S. at 222, 82 S.Ct. at 712–713 n. 48.

**27.** After thoroughly reviewing the decisions dealing with the guarantee clause, the Court observed that it has long "refused to resort to the Guaranty Clause ... as the source of a constitutional standard for invalidating state action." *Baker v. Carr, supra* note 11, 369 U.S. at 223, 82 S.Ct. at 713. The Court noted that guarantee-clause claims involve those elements which define a political question and, for that reason and no other, are nonjusticiable. While in *Baker* the Court intimates there may be instances in which the guarantee clause might be implicated, it does not say the guarantee clause is justiciable.

Shortly after *Baker*, in *Reynolds v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964), the Court held on equal protection grounds that certain apportionment plans in Alabama were unconstitutional. *Reynolds* reaffirmed two fundamental points in *Baker, supra* note 11, i.e., that reapportionment issues are fundamentally equal protection issues and that the guarantee clause is irrelevant to the problems of reapportionment.

In *Gregory v. Ashcroft,* —— U.S. ——, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991), the Court referred to the guarantee of a republican form of government in discussing "the States' constitutional power to establish the qualifications" "of their most important government officials." *Id.,* —— U.S. at —— and ——, 111 S.Ct. at 2401 and 2402. There, the Court was dealing with a preemption problem: whether Congress' 1974 amendment of the Age Discrimination in Employment Act of 1967—which extended the Act's substantive provisions to include the states as employers—took states out of the arena of legislating mandatory retirement age for its state judges. The Court held that judges were not included within the Act's definition of an employee. Unless Congress *clearly removes states from that arena,* the Court announced, there is no federal preemption under the Supremacy Clause, Art. 6, U.S. Const. Preemption deals with congressional power to legislate to the exclusion of the states on subjects upon which Congress has the power to make law—i.e., bankruptcy, interstate commerce and Indian commerce power. Congress draws its power from the federal constitution which limits its authority to properly reserved subjects. *Id.,* 111 S.Ct. at 2400. No preemption problem is presented by the initiative measure under consideration here. *Ashcroft* lends no support to the notion of guarantee-clause claims' justiciability.

**28.** 446 U.S. 156, 182 n. 17, 100 S.Ct. 1548, 1564, 64 L.Ed.2d 119 (1980).

**29.** *Brown v. State Election Board,* Okl., 369 P.2d 140, 149 (1962), citing *Colegrove v. Green, supra* note 22; *Pacific States Tel. & Tel. Co. v. Oregon, supra* note 20; *Luther v. Borden, supra* note 19.

In sum, the U.S. Supreme Court—the highest court with the power of judicature over federal constitutional standards—has *never held guarantee-clause claims to be justiciable.* The only permissible sanction the Court has recognized for a state's failure to conform to the guarantee clause is Congress' refusal to seat the senators and representatives, which is, of course, a purely political solution.[30] No precedent hence exists for today's review of the initiative measure before us for conformity to the guarantee clause.[31]

## III

### A

### THERE ARE NO JUDICIALLY ENFORCEABLE STANDARDS OF REPUBLICANISM

Assuming that guarantee-clause claims are justiciable, I would not attempt to review them *without any authoritative federal judicial parameters* for gauging institutional norms of state government for their conformity to the strictures of the guarantee clause. The task of measuring the limit of permissible nonrepublicanism is difficult because the Court has neither enforced the clause nor acted decisively in this matter.[32] The phrase "republican

**30.** See, e.g., *Luther v. Borden,* supra *note* 19; *Pacific States Tel. & Tel. Co. v. Oregon, supra* note 20; *Colegrove v. Green, supra* note 22; *Baker v. Carr, supra* note 11.

**31.** For state and lower federal court decisions that have disregarded the rule of nonjusticiability *see, e.g., In re Interrogatories Propounded by Senate, Etc.,* 189 Colo. 1, 536 P.2d 308 (1975); *People of City of Thornton v. Horan,* 192 Colo. 144, 556 P.2d 1217 (1976); *Vansickle v. Shanahan,* 212 Kan. 426, 511 P.2d 223 (1973); *Heimerl v. Ozaukee Cty.,* 256 Wis. 151, 40 N.W.2d 564 (1949); *Hoxie School Dist. v. Brewer,* 137 F.Supp. 364 (E.D.Ark.1956). If the avenue of relief must come from the Congress, we are without any warrant to usurp the congressional power. *The jurisprudence of state and lower federal courts is neither authority to nor persuasive upon this court.*

**32.** Neither *Baker v. Carr, supra* note 11, nor other Supreme Court jurisprudence has provided us with any standards or parameters for review of the Guarantee Clause.

form of government" does not have a fixed content either in law or in political science. There is no federally enshrined ideal to serve as a yardstick. Absent any guideposts, I would be loath to tell the people what encroachments *may or may not be permitted* on the constitutional guarantee of republicanism in form.[33]

### B

### U.S. SUPREME COURT GUARANTEE-CLAUSE JURISPRUDENCE PROVIDES NO CLEAR MANDATE TO STATE COURTS

By force of the Supremacy Clause[34] state courts are bound by the U.S. Supreme Court's jurisprudential exposition of federal law.[35] We cannot give the federal constitution a different sweep of meaning from that which the highest federal tribunal accords it.[36] On matters of federal constitutional validity, we follow U.S. Supreme Court standards. If justiciability is questionable and no parameters for measuring it exist, it is our duty to decline review until the U.S. Supreme Court has given us sufficient guidance. In short, on federal constitutional law matters we must relinquish our own notions of propriety and follow the U.S. Supreme Court jurisprudence.

**33.** We will not anticipate federal constitutional jurisprudence in advance of necessity. *Brown v. State Election Board, supra* note 29 at 152.

**34.** Art. 6, cl. 2, U.S. Const.; *McLin v. Trimble,* Okl., 795 P.2d 1035, 1044–1045 n. 5 (1990) (Opala, V.C.J., dissenting).

**35.** *United States v. Home Federal S. & L. Ass'n of Tulsa,* Okl., 418 P.2d 319, 325 (1966); *Dean v. Crisp,* Okl.Cr., 536 P.2d 961, 963 (1975); *McLin v. Trimble, supra* note 34 at 1044–1045 n. 5 (Opala, V.C.J., dissenting); *see also Walker v. Maruffi,* 105 N.M. 763, 737 P.2d 544, 547 (App. 1987).

**36.** When we invoke the federal constitution, our power cannot be any greater than that of the U.S. Supreme Court. While state courts have the same power to make federal constitutional jurisprudence that federal courts have, they cannot exceed it. Until the Court tells us that the guarantee clause is enforceable and gives us a standard for gauging conformity to it, we cannot ourselves fashion a federal constitutional remedy.

## SUMMARY

Because of my undiminished commitment to *Threadgill's* teachings and because judicial review of guarantee-clause claims is without any federal jurisprudential warrant, I would not today examine the measure for conformity to constitutional norms or to the republican form of government. The only options available as a remedy *against invasive initiative power* are (a) to curb—as Justice Mosk suggests [37]—the people's power to create chaos by constitutional amendment defining areas of regulation that lie outside the reserved power of initiative or (b) to act judicially and invalidate an actually *adopted measure when it visits crippling damage to the operations of government by causing institutional paralysis.*

*This* measure is fit for submission and I concur in the result of today's decision.

**37.** *Kennedy Wholesale v. Bd. of Equalization,* 53 Cal.3d 245, 279 Cal.Rptr. 325, 332, 806 P.2d 1360, 1367 (Cal.1991) (Mosk, J., concurring).